[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 358 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 359 
Our statute concerning tenures provides that "every citizen ofthe United States is capable of holding lands within this State, and of taking the same by descent, devise or purchase." (1 R.S., 719, § 8.) Aliens can neither take nor hold such lands except under certain conditions not claimed to exist here. (Id., §§ 15, 16, 17.)
The question, who are citizens of the United States, must depend upon the laws of the United States. In 1790, Congress passed an act declaring that "the children of citizens of the United States that may be born beyond the sea, or out of the limits of the United States, shall be considered as natural born citizens." (1 U.S. Statutes at Large, 103.) In 1795 the following provision was substituted for that previously existing, viz.: "The children of citizens of the United States, born out of the limits and jurisdiction of the United States, shall be considered as citizens of the United States." (1 U.S. Statutes at Large, 445, §§ 3, 4.) In 1802 Congress repealed the law of 1795, and enacted that, "The children of persons who now are or have been
citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States." This provision continued unchanged, until 1855, when an act was passed, declaring both the wife and children, in a case like the present, to be citizens. (10 Stat. at Large, 604.)
As the act of 1802 did not embrace the children of those who might thereafter become citizens, and as the father of the defendant, Maximo Ludlam, was born after 1802, and died before 1855, this case does not come within the provisions of any of the statutes of the United States on the subject. The same question is presented, therefore, in this respect, which arose in Lynch
v. Clark (1 Sandf. Ch. R., 583), where it is, I think, very clearly shown that, in the absence of any statute, or any decisions of our own courts, State or National, on the subject, the question of citizenship can only be determined by reference to the English common law, which, at the time of the adoption of the Constitution of the United States, was, to *Page 361 
a greater or less extent, recognized as the law of all the States by which that Constitution was adopted.
This conclusion does not involve the question very earnestly debated soon after the organization of the government, whether the common law of England became the law of the Federal Government, on the adoption of the Constitution. (1 Tucker's Blackstone, appendix E, p. 378; 1 Story's Com. on the Const., § 158, and note 2; Madison's Rep. to the Virginia Legislature, 1799, 1800; Instructions of Virginia to her Senators in Congress, January, 1800; Speech of Mr. Bayard on the Judiciary, 2 Benton's Debates, 616; 1 Kent's Com., 331, 343.) It only assumes, what has always been conceded, that the common law may properly be resorted to in determining the meaning of the terms used in the Constitution, where that instrument itself does not define them. Judge Tucker, at the close of his essay against the common law powers of the Federal Government, says: "We may fairly infer, from all that has been said, that the common law of England stands precisely upon the same footing in the Federal Government and the courts of the United States, as such, as the civil and ecclesiastical laws stand upon in England, that is to say, its maxims and rules of proceeding are to be adhered to, wheneverthe written law is silent, in cases of similar or analogousnature." (1 Tucker's Blackstone, app., E, p. 429.) The legislature of Virginia, in its instructions to the Senators of that state, in Congress, in January, 1800, directing them "to oppose the passage of any law founded on, or recognizing the principle, that the common law of England is in force under the government of the United States," expressly excepted "from such opposition, such particular parts of the common law as may have a sanction from the Constitution, so far as they are necessarilycomprehended in the technical phrases which express the powers delegated to the government." The Constitution uses, repeatedly, the terms, "citizen of the United States," but does not define them. Our statute, above referred to, uses the same terms, and also leaves them undefined. It becomes necessary for the court to decide whether the defendant, *Page 362 
Maximo M. Ludlam, under the circumstances of his birth and life, is a citizen of the United States within those terms. No case, so far as we are informed, presenting a similar question, has ever been before the courts in this country, state or national, and we are compelled, therefore, to exercise an arbitrary discretion, or to resort for precedents and information to English writers, and the decisions of English courts.
The question presented here, having been definitely disposed of, so far as related to England, by act of Parliament in the 7th year of Queen Anne, if not as early as the 25th of Edward III, no decisions on that subject since the earliest of those dates, of the courts of that country, based exclusively upon the prior common law, are to be found; and it is only by resorting to a more remote period in the history of the common law that we obtain any light to guide us to a decision of that question.
It seems to have been adjudged by the Court of King's Bench, as early as 7 Edw. III, that the children of British subjects, in the service of the king, though born beyond the sea, were capable of inheriting; and this was confirmed by Parliament in the 17th year of the same reign. (Dyer, 224 a., note 29.) An effort was made at the same Parliament to obtain a further declaration or enactment on the subject, which failed, but was renewed a few years afterwards, when the statute of 25 Edw. III, ch. 2, was passed, which, among other things, provides, that children, "which henceforth shall be born out of liegeance of the king, whose fathers and mothers, at the time of their birth, be and shall be, at the faith and liegeance of the king of England, shall have and enjoy the same benefit and advantage, to have and bear inheritance within the same liegeance, as the other inheritors aforesaid, in time to come, so also that the mothers of such children passed the sea by the license and will of their husbands."
It is essential to our present inquiry to ascertain whether this statute was introductory of a new rule, or simply declaratory of the previous law. There are considerations of weight on both sides of this question. The preamble shows that the *Page 363 
act was passed to complete what was left undone by the previous Parliament in 17 Edw. III, and the action of the latter Parliament was purely declaratory, as it simply confirmed what had been decided by the King's Bench ten years before. It also shows that the application to both parliaments was for the purpose of resolving a "doubt," and that the King, in order that the law on the subject be "declared and put in certain," caused Parliament "to deliberate" upon this doubt. The application to Parliament was by "petition," and of course came from the people; and it is well known how tenaciously the people of England, at that day, adhered to the rules of the common law, and how unwilling they were that Parliament should change them. It seems clear to me, therefore, that what was desired and expected from Parliament at this time was, not any new law, but simply a declaration removing the doubts which obtained as to the existing law.
On the other hand, the terms of the statute would seem to imply that the introduction of a new rule was intended. It is limited to children "henceforth" to be born, and provides for their inheritance "in time to come." It not unfrequently happens, however, that statutes are passed in language importing a new enactment, which afterwards prove to be merely confirmatory of the prior law. It is perhaps not easy to determine, therefore, from the statute itself, taken in connection with its history, whether it was in truth an enabling or a declaratory act. Principles, however, have, since the statute, been thoroughly settled, which in my view are decisive of the question.
The subject of alienage was very elaborately examined inCalvin's case. (7 Coke, 1, 6 James I.) Among the principles settled in that case, and which have remained unquestioned since, are these:
1. That natural allegiance does not depend upon locality or place; that it is purely mental in its nature, and cannot, therefore, be confined within any certain boundaries; or, to use the language of Coke, that "liegeance, and faith and truth, which are her members and parts, are qualities of the mind and soul *Page 364 
of man, and cannot be circumscribed within the predicament ofubi." (P. 76.)
2. That it is not sufficient, in a plea of alienage, to aver that the plaintiff was born out of the kingdom, or out of the jurisdiction of the king, but every such plea must aver that the plaintiff is not of the allegiance of the king; and judgment was given for the plaintiff in Calvin's case, "for that the plea in this case doth not refer faith or liegeance to the king indefinitely and generally, but limiteth and restraineth faith and liegeance to the kingdom." (Id., p. 10, a.)
3. That allegiance and protection (i.e., the rights and the duties of citizenship), are reciprocal, the one being the consideration for the other. (Id., p. 6, a.)
4. That a British subject, although residing abroad, still owes allegiance to the king of England.
It seems to me to result of necessity from these principles, that the children of English parents, though born abroad, are, nevertheless, regarded by the common law as natural born citizens of England. The decision upon the plea in Calvin's case, which was merely repeating what was decided in Cobbledike's case, as early as the reign of Edw. I. (See Calvin's case, p. 9 b.), necessarily implies that a child may owe allegiance to the king (i.e., not merely local or temporary, but natural and permanent allegiance), although born out of the king's dominions; and also, that this was a broad general rule, not confined to a few exceptional cases, because, if it was an exception, the plea could not have been held bad on demurrer, as it was in bothCobbledike's and Calvin's cases; but the exception must have been pleaded.
Now, upon what ground can allegiance in such cases be claimed? If natural allegiance, or allegiance by birth, does not depend upon boundaries or place, as Calvin's case asserts, upon what does it depend? There can be but one answer to the question. It is impossible to suggest any other ground for the obligation than that of parentage. It must, I apprehend, be transmitted from the parents to the child, or it could not exist. This being, then, the nature of permanent allegiance, *Page 365 
it follows that the king of England may properly claim allegiance from the children of his subjects, wherever born. If, then, the child of English parents, though born abroad, is, subditusnatus, a born subject of the king, he must also be a born citizen of the kingdom. Allegiance and citizenship are as we have seen, correlative terms, the one being the consideration of the other. So long, therefore, as the parents continue to owe allegiance to the crown of England, so long will their children, by the rules of the common law, whether born within or without the kingdom, owe similar allegiance, and be entitled to the corresponding rights of citizenship.
This conclusion needs no other support than the principles laid down in Calvin's case. It is sustained, however, by a remark in Brooke's Abridgement, Title Denizen 6, which is as follows: "Nota, per Hussey, chief justice. If a man be born beyond sea, whose father and mother are English, he should be inheritable before the statute, but the statute makes this clear." This opinion of Hussey is in no manner weakened by the case of Hyde
v. Hill (Cro. Eliz., 3), where it is said to have been held upon evidence, that, "if baron and feme, English, go beyond seawithout license, or tarry there after the time limited by thelicense, and have issue, that the issue is an alien, and not inheritable, contrary to the opinion of Hussey," because it is plainly implied in this that, if the parents were abroad, withlicense, their issue would inherit. The not being inheritable, therefore, was a penalty for the supposed offence of going abroad without license. When it came to be held, as it was later in the reign of Elizabeth (Dyer, 296, a.), and has been ever since, that it was not an offence to depart the kingdom without license, the penalty of course did not attach. What is meant by the words "contrary to the opinion of Hussey," does not distinctly appear. The case, as it is stated, tends, impliedly, to support the note in Brooke. The court must have had in view the common law, as the statute was not mentioned, and has nothing to do with the question of license. The right to go abroad, without license, appears to have been secured to the subject by the magna charta
of King *Page 366 
John; and how a license could afterwards have been supposed necessary, it is not easy to discover. The language is, "It shall be lawful, henceforth, for any one to go out of our kingdom, and return, safely and securely, by land or by water, saving hisallegiance to us, unless in time of war, by some short space, for the good of the kingdom." (Ch. 49.) Much more might be urged, but enough has, I think, been said to make it quite clear, both upon principle and authority, that the statute of 25 Edward III was merely declaratory of the common law. The reasoning here adopted is intended only to apply to cases where the fathers and mothers were natural born subjects of the king of England.
We have next to inquire what was rule of the common law in respect to children born abroad, when the father was a subject and the mother an alien. The earliest direct authority on this subject, to which we have been referred, is from Brooke's Abridgement, Title Denizen, 21, where it is said that, "if an Englishman pass the sea and marry an alien woman, by this the wife is of the king's allegiance, and the issue will inherit," for which reference is made to the Abridgement of Assizes. That the author speaks here of the common law, and not of the statute, is plain, from the reason he gives, viz.: that the wife owes allegiance in consequence of her marriage.
The question was very ably discussed in the case of Rex v.Eaton (Litt., 23.) An Englishman residing in Poland, as a merchant, married a Polish woman, and had children born there; and the question was, whether they were aliens. It was held that they were not. Several of the judges, it would seem, who or how many does not appear, held that the words "fathers and mothers," in 25 Edw. III, should be taken distributively, and to mean fathers or mothers. This ground, however, was not taken by the counsel who argued the case. He cited Bracton and Fleta in support of the position that, by the common law, where both father and mother were English, their children, born abroad, were not aliens; and argued that it could make no difference though the mother were alien, as it *Page 367 
was a settled maxim of the common law that the issue follows the condition of the father.
We have the opinion of Lord HALE upon this question, inCollingwood v. Pace. (1 Vent., 413, 422.) He says: "Although an English man marry an alien beyond the seas, and having there issue, the issue will be denizens, as hath been oftenresolved;" and that he put this upon the common law ground, that the issue take the condition of the father, without regard to that of the mother, and not upon the statute of Edw. III, appears from what follows; for he continues: "Yet it is without question that, if an English woman go beyond the seas, and marry an alien, and have issue born beyond the seas, the issue are aliens, for the wife was, sub potestate viri."
The opinion of Judge JENKINS was the same, as appears by the following case, put by him in his Reports: "A merchant trading in a foreign country, marries an alien there, and has issue by her born there, this issue shall be heir to his father, although his mother was not an English woman. Otherwise of an ambassador; for the business of a merchant requires a long abode abroad, if he will not trust his whole fortune to factors; it is not so of an ambassador, it is not his profession." (1 Jenk. Cent., case 2.) This distinction between a merchant and an ambassador, and the reason given for it, show conclusively that he put the case upon the common law, and not upon the statute; because, under the statute, no such distinction could be made.
These opinions are confirmed by that of the Court of King's Bench, in the case of Bacon v. Bacon (Cro. Car., 601.) There, children born in Poland were held not to be aliens. It is true, the father and mother in that case were both English; but the court said it would make no difference, though the mother were an alien. This was not put, as I understand the case, solely upon the statute by any of the judges. As the case before them came directly within the terms of the statute, it was natural that they should refer to it. But they seem to place their decision as much upon the common law as the statute. Their language is, "he being an English merchant, *Page 368 
and residing there for merchandising, his children shall, by thecommon law, or rather, as BERKELEY said, by the statute of 25 Edw. III, be accounted the King's lieges, as their father is." From this alone we might not be able to determine what the judges thought as to the common law. But they also say, that it would not be material, though the wife were an alien; for which they give this reason, viz.: that she is "sub potestate viri, andquasi under the allegiance of the King." This can have no reference to the statute. It is the common law argument upon the subject, and shows clearly the opinion of the judges to be, that the common law went further than the statute, and denizened the children in all cases where the father was a natural born subject.
I suppose the doctrine that children, if legitimate, follow, in regard to their political rights and duties, the condition of their fathers, to be founded in natural law, and to be substantially the same in most, if not all, civilized countries. Vattel says, "Society not being able to subsist and perpetuate itself but by the children of its citizens, those children naturally follow the condition of their fathers and succeed toall their rights." (B. 1, ch. 19, § 212.) In a subsequent section the same author says: "It is asked whether the children born of citizens in a foreign country are citizens? The laws have decided this question in several countries, and it is necessary to follow their regulations. By the law of nature alone,
children follow the condition of their fathers, and enter into all their rights. The place of birth produces no change in this particular, and cannot of itself furnish any reason for taking from a child what nature has given him. I say of itself, for the civil law, or politics, may order otherwise, from particular views." (Id., § 215.) It is shown by Vice-Chancellor SANDFORD, in Lynch v. Clark (1 Sandf. Ch. R., 583, 675), that the law of France, Spain and Portugal, is in accordance with this doctrine, by express enactment it is true, as it is now in England and in this country. But the uniformity goes to show that it is founded upon a law of nature, and of course prevails *Page 369 
in every country, unless, as Vattel says, it is changed by the municipal law, "from particular views."
The case of Duroure v. Jones (4 T.R., 300) is cited in opposition to these views. The question principally discussed in that case was upon the construction of the statute of Edward III, and not whether it was declaratory of the common law. It must be conceded, however, that the judges would seem to have assumed that it was an enabling act, and introductory of a new rule. It is also true that Blackstone and Chitty appear to have been of the same opinion. But neither the judges in that case, nor these elementary writers, appear to have discussed the question upon principle, or to have dwelt upon the authorities, which have been referred to here. Indeed there was no occasion for them to do so, the question having been disposed of in England by the statute. Chancellor KENT has examined the subject with more care, and although he expresses no decided opinion upon the question which I have considered, yet it may fairly be inferred from what he says, that in his opinion children born abroad, under such circumstances as attended the birth of Maximo Ludlam, might establish their citizenship, by reference to the principles of the common law, notwithstanding he speaks of those principles as "dormant and doubtful." (2 Com., 50-53.)
The correctness of this intimation of Chancellor KENT is controverted in an able article on the subject, published in 1854, in 2 Am. Law Reg. (p. 193), attributed to Mr. Horace Binney (Brightley's Dig., p. 132), which doubtless induced the passage of the Act of Congress of 1855, that act following literally its recommendations. By inducing the removal by Congress, for the future, of all doubt upon a question of such importance, that article has proved useful; but if it should have the effect, in regard to antecedent cases, to establish the position with which it commences, that all the children of American families "born in a foreign country are aliens," a vast balance of evil would be chargeable to its account. All the cases which the author cites to sustain his position have been above referred to; and after a careful examination of them, *Page 370 
I am satisfied that they do not sustain his conclusion. Besides, he does not notice the opinion of Lord HALE in Collingwood v.Pace, above referred to, which is directly adverse to his conclusion. If he had examined that opinion, he would not have said that the case of Rex v. Eaton was overruled by that ofDuroure v. Jones, because, upon the ground taken by Lord HALE, the two decisions are entirely consistent with each other. The injustice and inconvenience which would often result in the division of intestate's estates, from the rule that all foreign born children are aliens, furnish a strong argument against it, which tends to confirm the inference which I draw from the decided cases.
Such rule would not only most unjustly interrupt the course of descents, but other difficulties, not less serious, would result from its adoption. Our government, in common with every other civilized government, extends its protection over its citizens when in foreign countries, whether merely journeying there, or having a permanent domicil, for purposes of trade. (2 Phil. on Int. Law, 4; Halleck on Int. Law, ch. 29, § 4, p. 698.) It can hardly be doubted that it would protect the infant child of such citizen, though born abroad, to the same extent that it would protect the father.
Provision was made for the protection of English merchants residing abroad, by the great charter of King John. Chapters 47 and 48 are as follows: "All merchants shall have safe and secure conduct to go out of and to come into England, and to stay there, and to pass, as well by land as by water, to buy and sell by the ancient and allowed customs, without any extortion, except in time of war, or when they shall be of any nation at war with us.
"And if there shall be found any such in our land in the beginning of a war, they shall be attached, without damage to their bodies or goods, until it may be known unto us, or our chief justiciary, how our merchants are treated who happen to bein the country at war with us; and if ours be safe there, theirsshall be safe in our hands." Chapter 30 of the great charter of Henry III is to the same effect. (2 Inst., 57.) Would not the *Page 371 
persons who might be seized in England under these provisions, as hostages for the good treatment of English merchants by the hostile country, be held also as security for like treatment to the children of such merchants, though born abroad? It will hardly be questioned that protection would be thus extended.
An officer in command of one of our vessels of war was fully justified by our government in obtaining, by an exhibition of force, the surrender from an Austrian frigate, of Martin Koszta, a natural born citizen of Austria, claiming the rights of naturalization here, who had been forcibly and wrongfully seized in Smyrna, and taken on board the frigate. Can it be doubted that the same protection would have been extended to a minor child of Koszta, if he had been seized with his father, though born in Austria? The rule which we are asked to sanction would compel the government, in all such cases, to distinguish between father and child, extending its protection to the father, and denying it to the child.
The domicil of the minor child is always that of the father during his life (Westlake on Priv. Int. Law, 35; 5 Ves., 750, 787), and I think the same rule applies in regard to citizenship; that the citizenship of the father is that of the child, so far as the laws of the country of which the father is a citizen are concerned; but the child, from the circumstances of his birth in a country where the father is not a citizen, may acquire rights, and be subject to duties in regard to such country, which do not attach to the father.
It does not militate against this position, that by the law of England the children of alien parents, born within the kingdom, are held to be citizens. There are many instances of double allegiance; as for instance, one may owe a natural and permanent allegiance to the country of his birth, and a local and temporary allegiance to the country in which he resides. (Sherley's case,
Dyer, 144 a. Other cases will be referred to hereafter.) So, as I suppose, a child may be in a position which will enable him to elect, when he becomes of age, of which of two countries he will become a permanent citizen. *Page 372 
Indeed, the argument of the appellant's counsel here goes much further than that, and assumes that every adult citizen has that right. I do not apprehend that if a child, born in England of alien parents, should, before arriving at manhood, return to and become a permanent resident of the country to which his parents belonged, without any intention of ever returning to England, or of claiming any rights as a natural born citizen of that country, he would still be claimed as a subject of the British crown, and indictable for the crime of treason if he should take up arms against that country. Mr. Westlake says, speaking of the rule "which would impose the duty of allegiance on all those borninter quatuor maria": "We cannot believe that it was ever so strictly carried out, as that if a son was born in England to a foreign merchant, such son, on being afterwards taken in arms, a case one would imagine of no infrequent occurrence, should have been hung, drawn and quartered as a traitor." (Pr. Int. Law, ch. 2, § 12; Opinion of NORTHEY, Attorney-General, in the Case ofGillingham, Chalmers' Colonial Opinions, 645.)
Thus far, the case has been considered, rather with reference to the evidence given on the trial, than to the conclusions drawn by the court from that evidence. This court is bound by the report of the judge before whom the trial was had, in regard to the facts, so far as they are found by him, excepting that where there is any doubt or uncertainty as to the meaning of such report the evidence may be referred to, in aid of the report. (19 N Y, 210; 21 id., 550.) Among the facts found by the court are the following, viz.: "That Richard L. Ludlam, the father of the said Maximo M. Ludlam, and of the plaintiff, in the latter part of the year 1822, voluntarily expatriated himself from the United States, where he was a natural born citizen, for the purpose of becoming a permanent resident of Lima, in Peru, South America, and of establishing his permanent domicil there, and, in a few months thereafter, did become such permanent resident in such last named place, and there established his permanent domicil." *Page 373 
It becomes necessary for us to ascertain the meaning and determine the effect of this statement, and especially of that part of it which relates to expatriation. Webster's definition of the term "expatriate," is as follows: "in a general sense, to banish. To expatriate one's self, is to quit one's country, renouncing citizenship and allegiance in that country, to take residence and become a citizen in another country. The right toexpatriate one's self, is denied in feudal countries, and much controverted in the United States." Worcester's definition is, "To banish from one's native country; to remove from one's country." Expatriation, "Act of Expatriating; Banishment; Emigration."
There is nothing in the evidence to warrant the inference that Richard L. Ludlam, in leaving the United States, intended to renounce his allegiance to this country, or to become a citizen of Peru, or of any other country. If it were necessary to decide the question, I should be of opinion that the terms "expatriated himself," as used by the court at special term, were not intended to express the idea of a renunciation of allegiance, or citizenship, on the part of Richard L. Ludlam, but only a change of domicil, for the purpose of permanently engaging in business in the foreign country, with only such change of his relations to his native country as the laws of nations accord to such change of domicil. The repeated use of the word "domicil," in the report, which relates to residence only and not to citizenship, would strongly favor this construction.
Assuming, however, that we are to understand, from the finding of the court, that Richard L. Ludlam intended to renounce allegiance to his native country, and to become a citizen of Peru, that intention has never been carried into effect so as to divest him of his character as a citizen of the United States. The right of expatriation, on the part of citizens of the United States, without the consent of the government, has never been recognized by the courts of this country, or by any of the writers upon public law. Chancellor KENT, after giving a very careful review of the decisions *Page 374 
on the subject says: "The better opinion would seem to be that a citizen cannot renounce his allegiance to the United States, without the permission of government to be declared by law; and that, as there is no existing regulation in the case, the rule of the English common law remains unaltered." (2 Kent's Com., 49, and note a; Halleck's Int. Law, ch. 29, § 3.) Whether this statement of the law is to be considered as in all respects correct, may perhaps admit of doubt, as some courts and statesmen have been disposed to regard the right of expatriation as existing where the government has taken no steps to prohibit or limit it. The Court of Appeals of Kentucky has so decided, and that decision was approved by Attorney-General Cushing; and General Cass, when Secretary of State, went so far as to deny the right of governments to prohibit expatriation, except where the act of expatriation, if recognized, would deprive the government of the power to punish the citizen or subject for an offence previously committed. (Halleck's Int. Law, ch. 29, § 4.)
But none of the opinions go so far as to say that a citizen of any country can, by any act of his own, divest himself of such citizenship, until he becomes a citizen of another government. (9 Mass., 461.) Chief Justice ROBERTSON delivering the opinion of the Court of Appeals of Kentucky, in the case before referred to (9 Dana, 178), says: "The government, for the purpose of preventing abuse, and securing the public welfare, may regulate the mode of expatriation. But where it has not prescribed any limitation on this right, and the citizen has, in good faith, abjured his country, and become a citizen or subject of aforeign nation, he should, as to his native government, be considered as denationalized." (Halleck's Int. Law, supra; 1 Sandf. Ch. R., 657.) General Cass says: "The moment a foreignerbecomes naturalized, his allegiance to his native country is severed forever. He experiences a new political birth, a broad and impassable line separates him from his native country." (Halleck, ch. 29, § 4.) Westlake, in his treatise before cited, says: "Change of nationality involves *Page 375 
two points, the acquisition of a new national character and the loss of the old." (Id., 19, § 20.)
I cannot fully concur in the opinion expressed by the Court of Appeals of Kentucky, and by Secretary Cass, that a citizen has a right to renounce his allegiance at pleasure. The argument of Mr. Rutherforth, against the propriety of that doctrine, possesses much force. He says: "If each individual was at liberty to leave the state to which he belongs, whenever he pleases, civil society would be nothing but a rope of sand; it would be impossible for a common good to be effectually promoted, or for a common mischief to be effectually guarded against. Every member of the society would be at liberty either to continue in it, and endeavor to advance the general interest, or to leave it in order to advance a separate interest of his own. And in times of public distress, whoever could shift for himself, would be at liberty to do so, though he left the other members of the society to perish for want of his assistance. But the great end of forming civil societies is to promote a common good, and to guard against a common mischief. Certainly, therefore, the nature of civil society can never allow such a liberty as this to its members,because it is inconsistent with the end which a civil societyproposes to itself." (B. 2, ch. 2, § 7.)
Without, however, pursuing this subject further, it is sufficient for the present case, that all writers, including those who would give the greatest license to the citizen in the exercise of the power of expatriation, agree, that no person casts off his allegiance to his native country before he becomes a citizen or subject of another country; and as Richard L. Ludlam, whatever may have been the intention with which he left his native country, did not, so far as the case shows, become a citizen of any other country, he remained a citizen of the United States during all the time of his residence in Peru.
There is, in the present case, a narrower and more technical ground, which, so far as the intention with which Mr. Ludlam left the United States bears upon the question of his citizenship, leads to the same conclusion. When he left this *Page 376 
country, and is found by the report to have "expatriated himself," he was but 18 years of age, and, therefore, totally incapable of making any election in regard to his citizenship (26 Wend., 625), and the case is silent as to any later resolution by him on the subject. He has at all times, therefore, remained an American citizen, and, according to the established rule of the common law, partus sequitur patrem, communicated that character to his children born in Peru.
If we assume that the laws of Peru are similar to ours on the subject of citizenship, there is no doubt that Maximo Ludlam would be, in that country, regarded as a citizen of Peru. (1 Sandf. Ch., 583.) This would involve him, according to the rules which I find established, in a double allegiance, to this country and to Peru; and it cannot be denied that inconveniences might result from such a condition. The case, however, is not new, and I am not aware that any practical inconvenience has ever resulted to persons occupying such positions; their immunity in this respect resulting, mainly, it may be presumed, from the liberality of civilized governments toward persons thus situated. Many persons were placed in that position by the treaty of peace between this country and Great Britain, at the termination of the war waged to secure our independence, and the subject has been often discussed. (Ainslie v. Martin, 9 Mass., 460; 2 Kent's Com., 50.) In an opinion written in 1808, by Mr. Reeve, author of the History of the English Law, it is said: "As to the anomaly and inconsistency of Americans being citizens of the United States while there, and being British born subjects when here, this is not a novelty, nor is it peculiar to Americans. It may happen to any British subject, and it is allowable in our law, which recognizes this double character of a person being as was before shown, ad fidem utriusque regis. British subjects may voluntarily put themselves in such a situation; it is a part of the privileges of a British subject to be at liberty to do so. Have we not British subjects who are naturalized in Holland, in Russia, in Hamburgh, in various places on the continent of Europe? Do not British subjects become citizens of *Page 377 
the United States? Some persons are born to such doublecharacter; children and grandchildren, born of British parents in foreign countries, are British born subjects; yet these, no doubt, by the laws of the respective foreign countries, are also deemed natural born subjects there. I am aware of the difficulties which such persons may labor under with these double claims of allegiance upon them. Such difficulties must be got through, as circumstances will allow, and consideration should be had for the parties according to their respective situations, more especially with a distinction between those who brought themselves into such embarrassing situation voluntarily, and those who were born in it." * * "These are inconveniences in the way of full exercise and enjoyment of the rights in question, but detract nothing from the rights themselves. On the one hand, the king cannot reckon upon the full and absolute obedience of such persons, because they owe another fealty besides that due to him; on the other hand, the subject cannot have full enjoyment of his British rights." (Chalmers' Colonial Opinions, 702, 703; Westlake's Pr. Int. Law, p. 10, § 12, p. 20, § 22; 18 State Trials, 857.)
It is no part of my object to show how the difficulties growing out of the double allegiance to which, upon my theory, Maximo Ludlam may be subject, are to be surmounted; it is sufficient for my present purpose to show that there is nothing in the fact of such double allegiance, to which my conclusion subjects him, to demonstrate that such conclusion is unsound. No such difficulty would be likely to arise during his minority, and on his arriving at maturity he would have the right to elect one allegiance and repudiate the other, and such election would be conclusive upon him, and would doubtless be respected by the governments.
However this may be, the inconveniences of such double allegiance are rather theoretical than real. Practically, the person so situated secures all the rights of citizenship, or at least the right of inheritance, in two countries, and discharges the duties of allegiance in only one. The balance of advantages is decidedly in his favor. (Halleck, ch. 29, § 4) *Page 378 
I am, therefore, of opinion that Maximo Ludlam was an American citizen at the time of the decease of his uncle, and is entitled to share equally with his sister in the proceeds of the lands of which their uncle was seised at the time of his decease.
The judgment of the Supreme Court should be affirmed.
All the judges concurring,
Judgment affirmed.