LAMAR, Executor, *v.* MICOU, Administratrix.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued October 31, November 3, 1884.—Decided December 1, 1884.

The war of the rebellion, and the residence of both guardian and ward in the enemy's territory throughout the war, did not terminate the obligation of a guardian appointed before the war in a State never within that territory, nor discharge him from liability to account to the ward in the courts of that State after the war.

A receipt given to a guardian appointed in one State, by a guardian afterwards appointed in another State, for specific personal property of the ward, transferred by the former to the latter, does not discharge the former from responsibility to account for previous loss by his mismanagement of the ward's property. Nor is such responsibility lessened by the person last appointed guardian having before his appointment concurred and aided in the acts complained of.

Admissions by a ward's next of kin during the ward's lifetime cannot be set up in defence of a bill by such next of kin as the ward's administrator.

The widow of a citizen of one State does not, by marrying again, and taking the infant children of the first husband from that State to live with her at the home of the second husband in another State, change the domicil of the children.

A guardian, appointed in a State in which the ward is temporarily residing, cannot change the ward's domicil from one State to another.

A guardian, appointed in a State which is not the domicil of the ward, should not, in accounting in the State of his appointment for his investment of the ward's property, be held, unless in obedience to express statute, to a narrower range of securities than is allowed by the law of the State of the ward's domicil.

By the law of Georgia before 1863, and by the law of Alabama, a guardian might invest his ward's money in bank stock in Georgia or in New York, or in city bonds, or in bonds issued by a railroad corporation and indorsed by the State which had chartered it.

A guardian may, without order of court, sell personal property of the ward in his possession, and reinvest the proceeds.

A guardian, appointed in New York, before the war of the rebellion, of an infant then temporarily residing there, but domiciled in Georgia, sold bank stock of his ward in New York during the war, and there invested the proceeds in bonds issued before the war by the cities of Mobile, Memphis and New Orleans, and in bonds issued by a railroad corporation chartered by the State of Tennessee and whose road was in Tennessee and Georgia, and the railroad bonds indorsed by the State of Tennessee at the time of their issue; and deposited the bonds in a bank in Canada. *Held,* That if in so

doing he used due care and prudence, having regard to the best pecuniary interests of his ward, he was not accountable to the ward for loss by depreciation of the bonds, although one object of the sale and investment was to save the ward's money from confiscation by the United States.

An investment by a guardian, of money of his ward, during the war of the rebellion, and while both guardian and ward were residing within the enemy's territory, in bonds of the so-called Confederate States, was unlawful, and the guardian is responsible to the ward for the sum so invested.

This was an appeal by the executor of a guardian from a decree against him upon a bill in equity filed by the administratrix of his ward.

The original bill, filed on July 1, 1875, by Ann C. Sims, a citizen of Alabama, as administratrix of Martha M. Sims, in the Supreme Court of the State of New York, alleged that on December 11, 1855, the defendant's testator, Gazaway B. Lamar, was duly appointed, by the surrogate of the county of Richmond in that State, guardian of the person and estate of Martha M. Sims, an infant of six years of age, then a resident of that county, and gave bond as such, and took into his possession and control all her property, being more than $5,000; that on October 5, 1874, he died in New York, and on November 10, 1874, his will was there admitted to probate; and the defendant, a citizen of New York, was appointed his executor; and that he and his executor had neglected to render any account of his guardianship to the surrogate of Richmond county or to any court having cognizance thereof, or to the ward or her administratrix; and prayed for an account, and for judgment for the amount found to be due.

The defendant removed the case into the Circuit Court of the United States for the Southern District of New York; and there filed an answer, averring that in 1855, when Lamar was appointed guardian of Martha M. Sims, he was a citizen of Georgia, and she was a citizen of Alabama, having a temporary residence in the city of New York; that in the spring of 1861 the States of Georgia and Alabama declared themselves to have seceded from the United States, and to constitute members of the so-called Confederate States of America, whereupon a state of war arose between the United States and the Confederate States, which continued to be flagrant for

more than four years after; that Lamar and Martha M. Sims were in the spring of 1861 citizens and residents of the States of Georgia and Alabama respectively, and citizens of the Confederate States, and were engaged in aiding and abetting the State of Georgia and the so-called Confederate States in their rebellion against the United States, and she continued to aid and abet until the time of her death, and he continued to aid and abet till January, 1865; that the United States by various public acts declared all his and her property, of any kind, to be liable to seizure and confiscation by the United States, and they both were, by the various acts of Congress of the United States, outlawed and debarred of any access to any court of the United States, whereby it was impossible for Lamar to appear in the Surrogate's Court of Richmond county to settle and close his accounts there, and to be discharged from his liability as guardian, in consequence whereof the relation of guardian and ward, so far as it depended upon the orders of that court, ceased and determined; that, for the purpose of saving the ward's property from seizure and confiscation by the United States, Lamar, at the request of the ward and of her natural guardians, all citizens of the State of Alabama, withdrew the funds belonging to her from the city of New York, and invested them for her benefit and account in such securities as by the laws of the States of Alabama and Georgia and of the Confederate States he might lawfully do; that in 1864, upon the death of Martha M. Sims, all her property vested in her sister, Ann C. Sims, as her next of kin, and any accounting of Lamar for that property was to be made to her; that on March 15, 1867, at the written request of Ann C. Sims and of her natural guardians, Benjamin H. Micou was appointed her legal guardian by the Probate Court of Montgomery County, in the State of Alabama, which was at that time her residence, and Lamar thereupon accounted for and paid over all property, with which he was chargeable as guardian of Martha M. Sims, to Micou as her guardian, and received from him a full release therefor; and that Ann C. Sims when she became of age ratified and confirmed the same. To that answer the plaintiff filed a general replication.

The case was set down for hearing in the Circuit Court upon the bill, answer and replication, and a statement of facts agreed by the parties, in substance as follows:

On November 23, 1850, William W. Sims, a citizen of Georgia, died at Savannah in that State, leaving a widow, who was appointed his administratrix, and two infant daughters, Martha M. Sims, born at Savannah on September 8, 1849, and Ann C. Sims, born in Florida on June 1, 1851. In 1853 the widow married the Rev. Richard M. Abercrombie, of Clifton, in the county of Richmond and State of New York.

On December 11, 1855, on the petition of Mrs. Abercrombie, Gazaway B. Lamar, an uncle of Mr. Sims, and then residing at Brooklyn in the State of New York, was appointed by the surrogate of Richmond County guardian of the person and estate of each child "until she shall arrive at the age of fourteen years, and until another guardian shall be appointed;" and gave bond to her, with sureties, "to faithfully in all things discharge the duty of a guardian to the said minor according to law, and render a true and just account of all moneys and other property received by him, and of the application thereof, and of his guardianship in all respects, to any court having cognizance thereof;" and he immediately received from Mrs. Abercrombie in money $5,166.89 belonging to each ward, and invested part of it in January and April, 1856, in stock of the Bank of the Republic at New York, and part of it in March and July, 1857, in stock of the Bank of Commerce at Savannah, each of which was then paying, and continued to pay until April, 1861, good dividends annually, the one of ten and the other of eight per cent.

In 1856, several months after Lamar's appointment as guardian, Mr. and Mrs. Abercrombie removed from Clifton, in the State of New York, to Hartford, in the State of Connecticut, and there resided till her death in the spring of 1859. The children lived with Mr. and Mrs. Abercrombie, Lamar as guardian paying Mr. Abercrombie for their board, at Clifton and at Hartford, from the marriage until her death; and were then removed to Augusta in the State of Georgia, and there lived with their paternal grandmother and her unmarried

daughter and only living child, their aunt; Lamar as guardian continuing to pay their board. After 1856 neither of the children ever resided in the State of New York. On January 18, 1860, their aunt was married to Benjamin H. Micou, of Montgomery in the State of Alabama, and the children and their grandmother thereafter lived with Mr. and Mrs. Micou at Montgomery, and the children were educated and supported at Mr. Micou's expense.

From 1855 to 1859 Lamar resided partly in Georgia and partly in New York. In the spring of 1861 he had a temporary residence in the city of New York, and upon the breaking out of the war of the rebellion, and after removing all his own property, left New York, and passed through the lines to Savannah, and there resided, sympathizing with the rebellion, and doing what he could to accomplish its success, until January, 1865, and continued to have his residence in Savannah until 1872 or 1873, when he went to New York again, and afterwards lived there. Mr. and Mrs. Micou also sympathized with the rebellion and desired its success, and each of them, as well as Lamar, failed during the rebellion to bear true allegiance to the United States.

At the time of Lamar's appointment as guardian, ten shares in the stock of the Mechanics' Bank of Augusta in the State of Georgia, which had belonged to William W. Sims in his lifetime, stood on the books of the bank in the name of Mrs. Abercrombie as his administratrix, of which one-third belonged to her as his widow, and one-third to each of the infants. In January, 1856, the bank refused a request of Lamar to transfer one-third of that stock to him as guardian of each infant, but afterwards paid to him as guardian from time to time two-thirds of the dividends during the life of Mrs. Abercrombie, and all the dividends after her death until 1865. During the period last named, he also received as guardian the dividends on some other bank stock in Savannah, which Mrs. Abercrombie owned, and to which, on her death, her husband became entitled. Certain facts, relied on as showing that he, immediately after his wife's death, made a surrender of her interest in the bank shares to Lamar, as guardian of her children, are not

material to the understanding of the decision of this court, but are recapitulated in the opinion of the Circuit Court. 7 Fed. Rep. 180–185.

In the winter of 1861–62, Lamar, fearing that the stock in the Bank of the Republic at New York, held by him as guardian, would be confiscated by the United States, had it sold by a friend in New York; the proceeds of the sale, which were about twenty per cent. less than the par value of the stock, invested at New York in guaranteed bonds of the cities of New Orleans, Memphis and Mobile, and of the East Tennessee and Georgia Railroad Company; and those bonds deposited in a bank in Canada.

Lamar from time to time invested the property of his wards, that was within the so-called Confederate States, in whatever seemed to him to be the most secure and safe—some in Confederate States bonds, some in the bonds of the individual States which composed the confederacy, and some in bonds of cities and of railroad corporations and stock of banks within those States.

On the money of his wards, accruing from dividends on bank stock, and remaining in his hands, he charged himself with interest until the summer of 1862, when, with the advice and aid of Mr. Micou, he invested $7,000 of such money in bonds of the Confederate States and of the State of Alabama; and in 1863, with the like advice and aid, sold the Alabama bonds for more than he had paid for them, and invested the proceeds also in Confederate States bonds; charged his wards with the money paid, and credited them with the bonds; and placed the bonds in the hands of their grandmother, who gave him a receipt for them and held them till the end of the rebellion, when they, as well as the stock in the banks at Savannah, became worthless.

Martha M. Sims died on November 2, 1834, at the age of fifteen years, unmarried and intestate, leaving her sister Ann C. Sims her next of kin. On January 12, 1867, Lamar, in answer to letters of inquiry from Mr. and Mrs. Micou, wrote to Mrs. Micou that he had saved from the wreck of the property of his niece, Ann C. Sims, surviving her sister, three bonds of the city of Memphis, indorsed by the State of Tennessee, one bond of

the city of Mobile, and one bond of the East Tennessee and Georgia Railroad Company, each for $1,000, and with some coupons past due and uncollected ; and suggested that by reason of his age and failing health, and of the embarrassed state of his own affairs, Mr. Micou should be appointed in Alabama guardian in his stead. Upon the receipt of this letter Mrs. Micou wrote to Lamar, thanking him for the explicit statement of the niece's affairs, and for the care and trouble he had had with her property ; and Ann C. Sims, then nearly sixteen years old, signed a request, attested by her grandmother and by Mrs. Micou, that her guardianship might be transferred to Mr. Micou, and that he might be appointed her guardian. And on March 15, 1867, he was appointed guardian of her property by the Probate Court of the county of Montgomery and State of Alabama, according to the laws of that State, and gave bond as such.

On May 14, 1867, Lamar sent to Micou complete and correct statements of his guardianship account with each of his wards, as well as all the securities remaining in his hands as guardian of either, and a check payable to Micou as guardian of Ann C. Sims for a balance in money due her; and Micou, as such guardian, signed and sent to Lamar a schedule of and receipt for the property, describing it specifically, by which it appeared that the bonds of the cities of New Orleans and Memphis and of the East Tennessee and Georgia Railroad Company were issued, and the Memphis bonds, as well as the railroad bonds, were indorsed by the State of Tennessee, some years before the breaking out of the rebellion. Micou thenceforth continued to act in all respects as the only guardian of Ann C. Sims until she became of age on June 1 1872.

No objection or complaint was ever made by either of the wards, or their relatives, against Lamar's transactions or investments as guardian, until July 28, 1874, when Micou wrote to Lamar, informing him that Ann C. Sims desired a settlement of his accounts ; and that he had been advised that no credits could be allowed for the investments in Confederate States bonds, and that Lamar was responsible for the security of the investments in other bonds and bank stock. Lamar was then

sick in New York, and died there on October 5, 1874, without having answered the letter.

Before the case was heard in the Circuit Court, Ann C. Sims died on May 7, 1878; and on June 20, 1878, Mrs. Micou was appointed, in New York, administratrix *de bonis non* of Martha M. Sims, and as such filed a bill of revivor in this suit. On October 3, 1878, the defendant filed a cross bill, repeating the allegations of his answer to the original bill, and further averring that Ann C. Sims left a will, which had been admitted to probate in Montgomery County in the State of Alabama, and afterwards in the county and State of New York, by which she gave all her property to Mrs. Micou, who was her next of kin; and that Mrs. Micou was entitled to receive for her own benefit whatever might be recovered in the principal suit, and was estopped to deny the lawfulness or propriety of Lamar's acts, because whatever was done by him as guardian of Martha M. Sims in her lifetime, or as guardian of the interests of Ann C. Sims as her next of kin, was authorized and approved by Mrs. Micou and her mother and husband as the natural guardians of both children. Mrs. Micou, as plaintiff in the bill of revivor, answered the cross bill, alleging that Ann succeeded to Martha's property as administratrix, and not as her next of kin, admitting Ann's will and the probate thereof, denying that Mrs. Micou was a natural guardian of the children, and denying that she approved or ratified Lamar's acts as guardian. A general replication was filed to that answer.

Upon a hearing on the pleadings and the agreed statement of facts, the Circuit Court dismissed the cross bill, held all Lamar's investments to have been breaches of trust, and entered a decree referring the case to a master to state an account. The case was afterwards heard on exceptions to the master's report, and a final decree entered for the plaintiff for $18,705.19, including the value before 1861 of those bank stocks in Georgia of which Lamar had never had possession. The opinion delivered upon the first hearing is reported in 17 Blatchford, 378, and in 1 Fed. Rep. 14, and the opinion upon the second hearing in 7 Fed. Rep. 180. The defendant appealed to this court.

*Mr. Edward N. Dickerson* for appellant.—I. If the two wards had a domicil in the State of New York in 1855, the relation of guardian and ward under the New York appointment was terminated by the change of that domicil in 1856, or before February 9, 1862. A probate court has no jurisdiction of the affairs of an infant except when either the domicil or the property of the infant is within its jurisdiction. The domicil of an infant is the domicil of the father, if living, and if he is dead it is the domicil of the mother. *Pennsylvania* v. *Ravenel*, 21 How. 103. It has been held in New York that the acquisition of a new domicil by the widow by re-marriage does not necessarily change the domicil of her minor child. *Browns* v. *Lynch*, 2 Bradford, 214. In Massachusetts, a guardian, though not a parent, acting in good faith, may shift the ward's domicil with his own. *Holyoke* v. *Haskins*, 5 Pick. 20. All agree that the rights and powers of guardians are local. *Morrell* v. *Dickery*, 1 Johns. Ch. 153 ; *Woodworth* v. *Spring*, 4 Allen, 321. Lamar therefore was under no obligation under the laws of New York as to the wards or the property after they left that State. Although not formally released, he doubtless would have been so on application. In equity, acts done in good faith, for which an order would have passed in course on application, will be regarded as ordered. *Hunt* v. *Freeman*, 1 Ohio, 490, 2d Ed. 226 ; *Lee* v. *Stone*, 5 Gill & Johns. 1.—II. The guardianship of Lamar, under the laws of New York, terminated in 1861, by reason of the war, and has never been revived. This was the legal effect of a state of war. During its existence a public enemy was denied access to the courts and could not transact business. It terminated contracts and partnerships, and by parity of reasoning terminated such relations as guardian and ward. See *Lasere* v. *Rochereau*, 17 Wall. 437; *Ketchum* v. *Mobile & Ohio Railroad Co.*, 2 Woods, 532.—III. After the commencement of the war, Lamar did everything as to the property, which he could have been required to do had the guardianship continued. The rule in regard to investments of trust funds is not the same everywhere. In England they must be invested in consols. *Howe* v. *Dartmouth*, 7 Ves. 137; *Holland* v. *Hughes*, 16 Ves. 111. In Massachusetts, the guar-

dian is to exercise .the sound discretion which prudent men show in making permanent investments of funds with reference to the production of income. *Harvard College* v. *Amory*, 9 Pick. 446. In New York, he is bound to employ such diligence and prudence as prudent men employ in their own like affairs. *King* v. *Talbot*, 40 N. Y. 76. In Georgia, he was at that time bound to keep the money invested, and to do this in good faith upon security undoubted when taken. With the investments before war we have nothing to do. They were prudent, and could have been closed out at a profit \ hen the war began. The passage of the confiscation acts made it Lamar's duty to transfer the investments. See especially act of July 17, 1862, ch. 195, § 6, 12 Stat. 591. When the investments came within the territory dominated by the Confederates, an investment in the bonds of those States became justifiable. See *Barton* v. *Bowen*, 27 Grattan, 849 ; *Brown* v. *Wright*, 39 Georgia, 96. *Horn* v. *Lockhart*, 17 Wall. 570, was decided by a divided court, and ought not to be extended beyond the limits of that case.—IV. The appointment by the Alabama court of Micou as guardian operated to release Lamar.—V. Micou then, as lawful guardian acting for Miss Sims, gave Lamar a release, and when she became of age she could not deny its effect.— VI. Even if not operative as a receipt when given, it became an absolute release by lapse of time before the ward became of age.—VII. Miss Ann Sims is estopped by her conduct, after she became of age, from claiming that Lamar has not fully accounted to her. *Kirby* v. *Taylor*, 6 Johns. Ch. 242, 249 ; *Forbes* v. *Forbes*, 5 Gill, 29 ; *McClelland* v. *Kennedy*, 8 Maryland, 230.— VIII. Mrs. Micou, the defendant in error, has no better right to recover than Miss Ann Sims would have had.—IX. Whatever may have been Miss Ann Sims's rights, the defendant in error is not entitled to recover. Although suing as administratrix, the recovery will be really for her own benefit. In February, 1867, she approved of what Lamar had done as guardian, and did so again in 1874. What she said could have estopped her had she herself been the *cestui que trust*. *Mooers* v. *White*, 6 Johns. Ch. 360 ; *Weed* v. *Small*, 7 Paige, 573. See *Cairncross*
· *Lorimer*, 7 Jurist, (N. S.), 149 ; *Illinois Central Railroad*

v. *Allen*, 39 Ill. 205; *Tibbs* v. *Brown*, 2 Grant (Penn.) 39.—
X. There are the same estoppels as to the claim made in behalf
of Martha Sims as to that made in behalf of Ann Sims.

*Mr. Stephen P. Nash* and *Mr. George C. Holt* for appellee.
—I. A retiring guardian can only be discharged by order of
a competent court, or by settlement with the ward after the
latter attains majority. Perry on Trusts, §§ 921–923.—II.
Lamar's duties and obligations are to be measured by the law
of New York. Investments in bank stocks were unauthorized
by that law. *King* v. *Talbot*, 40 N. Y. 76; *Adair* v. *Brimmer*,
74 N. Y. 539. The investment in the Georgia bank was further
invalid as made out of the State. *Ormiston* v. *Olcott*, 84 N. Y.
339.—III. The transfer of the New York investments to invest-
ments in Confederate stocks during the war was an act in aid
of the rebellion, and was void; *Horn* v. *Lockhart*, 17 Wall. 570;
*McBurney* v. *Carson*, 99 U. S. 567; *Corker* v. *Jones*, 110 U. S.
317; and would have been disallowed in settlement of a
guardian's account in Alabama. *Newman* v. *Reed*, 50 Ala. 297;
*Houston* v. *Deloach*, 43 Ala. 364.—IV. The war did not ter-
minate the guardianship, nor affect the liability of the guardian
to account to the ward. War suspends, but does not annul
contract obligations. 3 Phillimore International Law, 735;
*Hanger* v. *Abbott*, 6 Wall. 533; *Insurance Co.* v. *Davis*, 95 U.
S. 425, 430. In the latter case the relation was that of principal
and agent, which bears a resemblance to that of guardian and
ward.—V. The fact that the ward lived in enemy's country
during the war is immaterial. She was too young to be dis-
loyal except by fiction of law. Even if active disloyalty had
been established, that would not have justified the guardian's
investments. *Horn* v. *Lockhart*, 17 Wall. 570; *Alexander* v.
*Bryan*, 110 U. S. 414.—VI. The fact that the ward's property
in New York was liable to confiscation is no justification for
its transfer and investment in Southern securities. The rights
of Southern enemies to property within the loyal States were
not affected unless proceedings were taken for confiscation.
*Conrad* v. *Waples*, 96 U. S. 279; *Airhart* v. *Massieu*, 98 U.
S. 491.—VII. The appointment of Micou as guardian of Ann

Sims and Lamar's transfer to him of the remaining securities were no defence. A guardian continues to retain all his powers and to be subject to all his duties and liabilities till the appointment of a successor by the same court which appointed him. *In re Dyer*, 5 Paige, 534; *In re Nicoll*, 1 Johns. Ch. 25. —VIII. The defence of ratification is inapplicable. Martha died before she became of age. She therefore could not ratify. Ann is it is true in some sense the representative of her sister, but she never ratified as representative. The defence of ratification must be clearly proved, and it must appear that the party ratifying had full knowledge of the facts. *Adair* v. *Brimmer*, cited above. An administratrix suing is not chargeable with notice acquired before her appointment. 1 Greenl. Ev. § 179; 1 Cowen & Hill Notes to Phil. Ev. Ch. 8, § 10. As Ann and Mrs. Micou at the time of these investments had no interest in Martha's property, there was nothing for an estoppel to work on. *Ex parte Smith*, 2 Mont. D. & DeG. 113; *Dillett* v. *Kemble*, 10 C. E. Green, 66; *Plant* v. *McEwen*, 4 Conn. 544.—IX. The guardian was chargeable with the full value of the shares in Mechanics' Bank, Georgia, standing in the name of Mrs. Abercrombie, as administratrix, and in the shares of the Bank of Commerce standing in her name individually. It is the duty of a guardian to take all reasonable steps to collect and protect the property of his ward, whether situated in the State where he is appointed or not. It is true that a guardianship is a local office, but that does not authorize a guardian to shut his eyes and let his ward's property in other States go to waste. *Taylor* v. *Bemiss*, 110 U. S. 42; *Shultz* v. *Pulver*, 3 Paige, 182; affirmed 11 Wend. 361; *Matter of Butler*, 38 N. Y. 397.—X. There was no error in charging the guardian with interest at six per cent. *King* v. *Talbot*, cited above. That is the rule in New York; and the United States court will follow the State rule. *Suydam* v. *Williamson*, 24 How. 427; *Pennington* v. *Gibson*, 16 How. 65.

Mr. Justice Gray delivered the opinion of the court. He recited the facts as above stated, and continued:

The authority of the Surrogate's Court of the county of Rich-

mond and State of New York to appoint Lamar guardian of the persons and property of infants at the time within that county, and the authority of the Supreme Court of the State of New York, in which this suit was originally brought, being a court of general equity jurisdiction, to take cognizance thereof, are not disputed; and upon the facts agreed it is quite clear that none of the defences set up in the answer afford any ground for dismissing the bill.

The war of the rebellion, and the residence of both ward and guardian within the territory controlled by the insurgents, did not discharge the guardian, from his responsibility to account, after the war, for property of the wards which had at any time come into his hands, or which he might by the exercise of due care have obtained possession of. A state of war does not put an end to pre-existing obligations, or transfer the property of wards to their guardians, or release the latter from the duty to keep it safely, but suspends until the return of peace the right of any one residing in the enemy's country to sue in our courts. *Ward* v. *Smith*, 7 Wall. 447; *Montgomery* v. *United States*, 15 Wall. 395, 400; *Insurance Co.* v. *Davis*, 95 U. S. 425, 430; *Kershaw* v. *Kelsey*, 100 Mass. 5C1, 563, 564, 570; 3 Phillimore International Law (2d ed.) § 589.

The appointment of Micou in 1867 by a court of Alabama to be guardian of the surviving ward, then residing in that State, did not terminate Lamar's liability for property of his wards which he previously had or ought to have taken possession of. The receipt given by Micou was only for the securities and money actually handed over to him by Lamar; and if Micou had any authority to discharge Lamar from liability for past mismanagement of either ward's property, he never assumed to do so.

The suggestion in the answer, that the surviving ward, upon coming of age, ratified and approved the acts of Lamar as guardian, finds no support in the facts of the case.

The further grounds of defence, set up in the cross bill, that Micou participated in Lamar's investments, and that Mrs. Micou approved them, are equally unavailing. The acts of Micou, before his own appointment as guardian, could not bind

the ward. And admissions in private letters from Mrs. Micou to Lamar could not affect the rights of the ward, or Mrs. Micou's authority, upon being afterwards appointed administratrix of the ward, to maintain this bill as such against Lamar's representative, even if the amount recovered will inure to her own benefit as the ward's next of kin. 1 Greenl. Ev. § 179.

The extent of Lamar's liability presents more difficult questions of law, now for the first time brought before this court.

The general rule is everywhere recognized, that a guardian or trustee, when investing property in his hands, is bound to act honestly and faithfully, and to exercise a sound discretion, such as men of ordinary prudence and intelligence use in their own affairs. In some jurisdictions, no attempt has been made to establish a more definite rule; in others, the discretion has been confined, by the legislature or the courts, within strict limits.

The Court of Chancery, before the Declaration of Independence, appears to have allowed some latitude to trustees in making investments. The best evidence of this is to be found in the judgments of Lord Hardwicke. He held, indeed, in accordance with the clear weight of authority before and since, that money lent on a mere personal obligation, like a promissory note, without security, was at the risk of the trustee. *Ryder.* v. *Bickerton,* 3 Swanston, 80, note; *S. C.* 1 Eden, 149, note; *Barney* v. *Saunders,* 16 How. 535, 545; Perry on Trusts, § 453. But in so holding, he said: "For it should have been on some such security as binds land, or something, to be answerable for it." 3 Swanston, 81, note. Although in one case he held that a trustee, directed by the terms of his trust to invest the trust money in government funds or other good securities, was responsible for a loss caused by his investing it in South Sea stock; and observed that neither South Sea stock nor bank stock was considered a good security, because it depended upon the management of the governor and directors, and the capital might be wholly lost; *Trafford* v. *Boehm,* 3 Atk. 440, 444; yet in another case he declined to charge a trustee for a loss on South Sea stock which had fallen in value since the trustee received it; and said that "to compel trustees

to make up a deficiency, not owing to their wilful default, is the harshest demand that can be made in a court of equity." *Jackson* v. *Jackson*, 1 Atk. 513, 514; *S. C.* West Ch. 31, 34. In a later case he said: "Suppose a trustee, having in his hands a considerable sum of money, places it out in the funds, which afterwards sink in their value, or on a security at the time apparently good, which afterwards turns out not to be so, for the benefit of the *cestui que trust*, was there ever an instance of the trustee's being made to answer the actual sum so placed out? I answer, No. If there is no *mala fides*, nothing wilful in the conduct of the trustee, the court will always favor him. For as a trust is an office necessary in the concerns between man and man, and which, if faithfully discharged, is attended with no small degree of trouble and anxiety, it is an act of great kindness in any one to accept it; to add hazard or risk to that trouble, and subject a trustee to losses which he could not foresee, and consequently not prevent, would be a manifest hardship, and would be deterring every one from accepting so necessary an office." That this opinion was not based upon the fact that in England trustees usually receive no compensation is clearly shown by the Chancellor's adding that the same doctrine held good in the case of a receiver, an officer of the court, and paid for his trouble; and the point decided was that a receiver, who paid the amount of rents of estates in his charge to a Bristol tradesman of good credit, taking his bills therefor on London, was not responsible for the loss of the money by his becoming bankrupt. *Knight* v. *Plymouth*, 1 Dickens, 120, 126, 127; *S. C.* 3 Atk. 480. And the decision was afterwards cited by Lord Hardwicke himself as showing that when trustees act by other hands, according to the usage of business, they are not answerable for losses. *Ex parte Belchier*, Ambler, 218, 219; *S. C.* 1 Kenyon, 38, 47.

In later times, as the amount and variety of English government securities increased, the Court of Chancery limited trust investments to the public funds, disapproved investments either in bank stock, or in mortgages of real estate, and prescribed so strict a rule that Parliament interposed; and by the statutes of 22 & 23 Vict. ch. 35, and 23 & 24 Vict. ch. 38, and by general

orders in chancery, pursuant to those statutes, trustees have been authorized to invest in stock of the Bank of England or of Ireland, or upon mortgage of freehold or copyhold estates, as well as in the public funds. Lewin on Trusts (7th ed.) 282, 283, 287.

In a very recent case, the Court of Appeal and the House of Lords, following the decisions of Lord Hardwicke, in *Knight* v. *Plymouth* and *Ex parte Belchier*, above cited, held that a trustee investing trust funds, who employed a broker to procure securities authorized by the trust, and paid the purchase money to the broker, if such was the usual and regular course of business of persons acting with reasonable care and prudence on their own account, was not liable for the loss of the money by fraud of the broker. Sir George Jessel, M. R., Lord Justice Bowen, and Lord Blackburn affirmed the general rule that a trustee is only bound to conduct the business of his trust in the same manner that an ordinary prudent man of business would conduct his own ; Lord Blackburn adding the qualification that " a trustee must not choose investments other than those which the terms of his trust permit." *Speight* v. *Gaunt*, 22 Ch. D. 727, 739, 762 ; 9 App. Cas. 1, 19.

In this country, there has been a diversity in the laws and usages of the several States upon the subject of trust investments.

In New York, under Chancellor Kent, the rule seems to have been quite undefined. See *Smith* v. *Smith*, 4 Johns. Ch. 281, 285 ; *Thompson* v. *Brown*, 4 Johns. Ch. 619, 628, 629, where the chancellor quoted the passage above cited from Lord Hardwicke's opinion in *Knight* v. *Plymouth*. And in *Brown* v. *Campbell*, Hopk. Ch. 233, where an executor in good faith made an investment, considered at the time to be advantageous, of the amount of two promissory notes, due to his testator from one manufacturing corporation, in the stock of another manufacturing corporation, which afterwards became insolvent, Chancellor Sanford held that there was no reason to charge him with the loss. But by the later decisions in that State investments in bank or railroad stock have been held to be at the risk of the trustee, and it has been intimated that the

only investments that a trustee can safely make without an express order of court are in government or real estate securities. *King* v. *Talbot*, 40 N. Y. 76, affirming *S. C.* 50 Barb. 453; *Ackerman* v. *Emott*, 4 Barb. 626; *Mills* v. *Hoffman*, 26 Hun, 594; 2 Kent Com. 416, note *b*. So the decisions in New Jersey and Pennsylvania tend to disallow investments in the stock of banks or other business corporations, or otherwise than in the public funds or in mortgages of real estate. *Gray* v. *Fox*, Saxton, 259, 268; *Halstead* v. *Meeker*, 3 C. E. Green, 136; *Lathrop* v. *Smalley*, 8 C. E. Green, 192; *Worrell's Appeal*, 9 Penn. St. 508, and 23 Penn. St. 44; *Hemphill's Appeal*, 18 Penn. St. 303; *Ihmsen's Appeal*, 43 Penn. St. 431. And the New York and Pennsylvania courts have shown a strong disinclination to permit investments in real estate or securities out of their jurisdiction. *Ormiston* v. *Olcott*, 84 N. Y. 339; *Rush's Estate*, 12 Penn. St. 375, 378.

In New England, and in the Southern States, the rule has been less strict.

In Massachusetts, by a usage of more than half a century, approved by a uniform course of judicial decision, it has come to be regarded as too firmly settled to be changed, except by the legislature, that all that can be required of a trustee to invest is that he shall conduct himself faithfully and exercise a sound discretion, such as men of prudence and intelligence exercise in the permanent disposition of their own funds, having regard not only to the probable income, but also to the probable safety of the capital; and that a guardian or trustee is not precluded from investing in the stock of banking, insurance, manufacturing or railroad corporations, within or without the State. *Harvard College* v. *Amory*, 9 Pick. 446, 461; *Lovell* v. *Minot*, 20 Pick. 116, 119; *Kinmonth* v. *Brigham*, 5 Allen, 270, 277; *Clark* v. *Garfield*, 8 Allen, 427; *Brown* v. *French*, 125 Mass. 410; *Bowker* v. *Pierce*, 130 Mass. 262. In New Hampshire and in Vermont, investments, honestly and prudently made, in securities of any kind that produce income, appear to be allowed. *Knowlton* v. *Bradley*, 17 N. H. 458; *Kimball* v. *Reding*, 11 Foster, 352, 374; *French* v. *Currier*, 47 N. H. 88, 99; *Barney* v. *Parsons*, 54 Vermont, 623.

In Maryland, good bank stock, as well as government securities and mortgages on real estate, has always been considered a proper investment. *Hammond* v. *Hammond*, 2 Bland, 306, 413; *Gray* v. *Lynch*, 8 Gill, 403; *Murray* v. *Feinour*, 2 Maryland Ch. 418. So in Mississippi, investment in bank stock is allowed. *Smyth* v. *Burns*, 25 Mississippi, 422.

In South Carolina, before the war, no more definite rule appears to have been laid down than that guardians and trustees must manage the funds in their hands as prudent men manage their own affairs. *Boggs* v. *Adger*, 4 Rich. Eq. 408, 411; *Spear* v. *Spear*, 9 Rich. Eq. 184, 201; *Snelling* v. *McCreary*, 14 Rich. Eq. 291, 300.

In Georgia, the English rule was never adopted; a statute of 1845, which authorized executors, administrators, guardians and trustees, holding any trust funds, to invest them in securities of the State, was not considered compulsory; and before January 1, 1863 (when that statute was amended by adding a provision that any other investment of trust funds must be made under a judicial order, or else be at the risk of the trustee), those who lent the fund at interest, on what was at the time considered by prudent men to be good security, were not held liable for a loss without their fault. Cobb's Digest, 333; Code of 1861, § 2308; *Brown* v. *Wright*, 39 Georgia, 96; *Moses* v. *Moses*, 50 Georgia, 9, 33.

In Alabama, the Supreme Court, in *Bryant* v. *Craig*, 12 Alabama, 354, 359, having intimated that a guardian could not safely invest upon either real or personal security without an order of court, the legislature, from 1852, authorized guardians and trustees to invest on bond and mortgage, or on good personal security, with no other limit than fidelity and prudence might require. Code of 1852, § 2024; Code of 1867, § 2426; *Foscue* v. *Lyon*, 55 Alabama, 440, 452.

The rules of investment varying so much in the different States, it becomes necessary to consider by what law the management and investment of the ward's property should be governed.

As a general rule (with some exceptions not material to the consideration of this case) the law of the domicil governs the

status of a person, and the disposition and management of his movable property. The domicil of an infant is universally held to be the fittest place for the appointment of a guardian of his person and estate; although, for the protection of either, a guardian may be appointed in any State where the person or any property of an infant may be found. On the continent of Europe, the guardian appointed in the State of the domicil of the ward is generally recognized as entitled to the control and dominion of the ward and his movable property everywhere, and guardians specially appointed in other States are responsible to the principal guardian. By the law of England and of this country, a guardian appointed by the courts of one State has no authority over the ward's person or property in another State, except so far as allowed by the comity of that State, as expressed through its legislature or its courts; but the tendency of modern statutes and decisions is to defer to the law of the domicil, and to support the authority of the guardian appointed there. *Hoyt* v. *Sprague*, 103 U. S. 613, 631, and authorities cited; *Morrell* v. *Dickey*, 1 Johns. Ch. 153; *Woodworth* v. *Spring*, 4 Allen, 321; *Milliken* v. *Pratt*, 125 Mass. 374, 377, 378; *Leonard* v. *Putnam*, 51 N. H. 247; *Commonwealth* v. *Rhoads*, 37 Penn. St. 60; *Sims* v. *Renwick*, 25 Georgia, 58; Dicey on Domicil, 172–176; Westlake Private International Law (2d ed.) 48–50; Wharton Conflict of Laws (2d ed.) §§ 259–268.

An infant cannot change his own domicil. As infants have the domicil of their father, he may change their domicil by changing his own; and after his death the mother, while she remains a widow, may likewise, by changing her domicil, change the domicil of the infants; the domicil of the children, in either case, following the independent domicil of their parent. *Kennedy* v. *Ryall*, 67 N. Y. 379; *Potinger* v. *Wightman*, 3 Meriv. 67; *Dedham* v. *Natick*, 16 Mass. 135; Dicey on Domicil, 97–99. But when the widow, by marrying again, acquires the domicil of a second husband, she does not, by taking her children by the first husband to live with her there, make the domicil which she derives from her second husband their domicil; and they retain the domicil which they had, before her second marriage, acquired from her or from their father.

*Cumner* v. *Milton*, 3 Salk. 259; *S. C.* Holt, 578; *Freetown* v. *Taunton*, 16 Mass. 52; *School Directors* v. *James*, 2 Watts & Sergeant, 568; *Johnson* v. *Copeland*, 35 Alabama, 521; *Brown* v. *Lynch*, 2 Bradford, 214; *Mears* v. *Sinclair*, 1 West Virginia, 185; Pothier Introduction Générale aux Coutumes, No. 19; 1 Burge Colonial and Foreign Law, 39; 4 Phillimore International Law (2d ed.) § 97.

The preference due to the law of the ward's domicil, and the importance of a uniform administration of his whole estate, require that, as a general rule, the management and investment of his property should be governed by the law of the State of his domicil, especially when he actually resides there, rather than by the law of any State in which a guardian may have been appointed or may have received some property of the ward. If the duties of the guardian were to be exclusively regulated by the law of the State of his appointment, it would follow that in any case in which the temporary residence of the ward was changed from State to State, from considerations of health, education, pleasure or convenience, and guardians were appointed in each State, the guardians appointed in the different States, even if the same persons, might be held to diverse rules of accounting for different parts of the ward's property. The form of accounting, so far as concerns the remedy only, must indeed be according to the law of the court in which relief is sought; but the general rule by which the guardian is to be held responsible for the investment of the ward's property is the law of the place of the domicil of the ward. Bar International Law, §. 106 (Gillespie's translation), 438; Wharton Conflict of Laws, § 259.

It may be suggested that this would enable the guardian, by changing the domicil of his ward, to choose for himself the law by which he should account. Not so. The father; and after his death the widowed mother, being the natural guardian, and the person from whom the ward derives his domicil, may change that domicil. But the ward does not derive a domicil from any other than a natural guardian. A testamentary guardian nominated by the father may have the same control of the ward's domicil that the father had. *Wood* v. *Wood*, 5

Paige, 596, 605. And any guardian, appointed in the State of the domicil of the ward, has been generally held to have the power of changing the ward's domicil from one county to another within the same State and under the same law. *Cutts* v. *Haskins*, 9 Mass. 543; *Holyoke* v. *Haskins*, 5 Pick. 20; *Kirkland* v. *Whately*, 4 Allen, 462; *Anderson* v. *Anderson*, 42 Vermont, 350; *Ex parte Bartlett*, 4 Bradford, 221; *The Queen* v. *Whitby*, L. R. 5 Q. B. 325, 331. But it is very doubtful, to say the least, whether even a guardian appointed in the State of the domicil of the ward (not being the natural guardian or a testamentary guardian) can remove the ward's domicil beyond the limits of the State in which the guardian is appointed and to which his legal authority is confined. *Douglas* v. *Douglas*, L. R. 12 Eq. 617, 625; *Daniel* v. *Hill*, 52 Alabama, 430; Story Conflict of Laws, § 506, note; Dicey on Domicil, 100, 132. And it is quite clear that a guardian appointed in a State in which the ward is temporarily residing cannot change the ward's permanent domicil from one State to another.

The case of such a guardian differs from that of an executor of, or a trustee under, a will. In the one case, the title in the property is in the executor or the trustee; in the other, the title in the property is in the ward, and the guardian has only the custody and management of it, with power to change its investment. The executor or trustee is appointed at the domicil of the testator; the guardian is most fitly appointed at the domicil of the ward, and may be appointed in any State in which the person or any property of the ward is found. The general rule which governs the administration of the property in the one case may be the law of the domicil of the testator; in the other case, it is the law of the domicil of the ward.

As the law of the domicil of the ward has no extra-territorial effect, except by the comity of the State where the property is situated, or where the guardian is appointed, it cannot of course prevail against a statute of the State in which the question is presented for adjudication, expressly applicable to the estate of a ward domiciled elsewhere. *Hoyt* v. *Sprague*, 103 U. S. 613. Cases may also arise with facts so peculiar or so

complicated as to modify the degree of influence that the court in which the guardian is called to account may allow to the law of the domicil of the ward, consistently with doing justice to the parties before it. And a guardian, who had in good faith conformed to the law of the State in which he was appointed, might perhaps be excused for not having complied with stricter rules prevailing at the domicil of the ward. But in a case in which the domicil of the ward has always been in a State whose law leaves much to the discretion of the guardian in the matter of investments, and he has faithfully and prudently exercised that discretion with a view to the pecuniary interests of the ward, it would be inconsistent with the principles of equity to charge him with the amount of the moneys invested, merely because he has not complied with the more rigid rules adopted by the courts of the State in which he was appointed.

The domicil of William W. Sims during his life and at the time of his death in 1850 was in Georgia. This domicil continued to be the domicil of his widow and of their infant children until they acquired new ones. In 1853, the widow, by marrying the Rev. Mr. Abercrombie, acquired his domicil. But she did not, by taking the infants to the home, at first in New York and afterwards in Connecticut, of her new husband, who was of no kin to the children, was under no legal obligation to support them, and was in fact paid for their board out of their property, make his domicil, or the domicil derived by her from him, the domicil of the children of the first husband. Immediately upon her death in Connecticut, in 1859, these children, both under ten years of age, were taken back to Georgia to the house of their father's mother and unmarried sister, their own nearest surviving relatives; and they continued to live with their grandmother and aunt in Georgia until the marriage of the aunt in January, 1860, to Mr. Micou, a citizen of Alabama, after which the grandmother and the children resided with Mr. and Mrs. Micou at their domicil in that State.

Upon these facts, the domicil of the children was always in Georgia from their birth until January, 1860, and thenceforth

was either in Georgia or in Alabama. As the rules of investment prevailing before 1863 in Georgia and in Alabama did not substantially differ, the question in which of those two States their domicil was is immaterial to the decision of this case; and it is therefore unnecessary to consider whether their grandmother was their natural guardian, and as such had the power to change their domicil from one State to another. See Hargrave's note 66 to Co. Lit. 88 *b*; Reeve Domestic Relations, 315 ; 2 Kent Com. 219; Code of Georgia of 1861, §§ 1754, 2452 ;· *Darden* v. *Wyatt*, 15 Georgia, 414.

Whether the domicil of Lamar in December, 1855, when he was appointed in New York guardian of the infants,. was in New York or in Georgia, does not distinctly appear, and is not material; because, for the reasons already stated, wherever his domicil was, his duties as guardian in the management and investment of the property of his wards were to be regulated by the law of their domicil.

It remains to apply the test of that law to Lamar's acts or ·omissions with regard to the various kinds of securities in which the property of the wards was invested.

1. The sum which Lamar received in New York in money from Mrs. Abercrombie he invested in 1856 and 1857 in stock of the Bank of the Republic at New York, and of the Bank of Commerce at Savannah, both of which were then, and continued till the breaking out of the war, in sound condition, paying good dividends. There is nothing to raise a suspicion that Lamar, in making these investments, did not use the highest degree of prudence ; and they were such as by the law of Georgia or of Alabama he might properly make. Nor is there any evidence that he was guilty of neglect in not withdrawing the investment in the stock of the Bank of Commerce at Savannah before it became worthless. He should not therefore be charged with the loss of that stock.

The investment in the stock of the Bank of the Republic of New York being a proper investment by the law of the domicil of the wards, and there being no evidence that the sale of that stock by Lamar's order in New York in 1862 was not judicious, or was for less than its fair market price, he was not

responsible for the decrease in its value between the times of its purchase and of its sale. He had the authority, as guardian, without any order of court, to sell personal property of his ward in his own possession, and to reinvest the proceeds. *Field* v. *Schieffelin*, 7 Johns. Ch. 150; *Ellis* v. *Essex Merrimack Bridge*, 2 Pick. 243. That his motive in selling it was to avoid its being confiscated by the United States does not appear to us to have any bearing on the rights of these parties. And no statute under which it could have been confiscated has been brought to our notice. The act of July 17, 1862, ch. 195, §-6, cited by the appellant, is limited to property of persons engaged in or abetting armed rebellion, which could hardly be predicated of two girls under thirteen years of age. 12 Stat. 591. Whatever liability, criminal or civil, Lamar may have incurred or avoided as towards the United States, there was nothing in his selling this stock, and turning it into money, of which his wards had any right to complain.

As to the sum received from the sale of the stock in the Bank of the Republic, we find nothing in the facts agreed by the parties, upon which the case was heard, to support the argument that Lamar, under color of protecting his wards' interests, allowed the funds to be lent to cities and other corporations which were aiding in the rebellion. On the contrary, it is agreed that that sum was applied to the purchase in New York of guaranteed bonds of the cities of New Orleans, Memphis and Mobile, and of the East Tennessee and Georgia Railroad Company; and the description of those bonds, in the receipt afterwards given by Micou to Lamar, shows that the bonds of that railroad company, and of the cities of New Orleans and Memphis, at least, were issued some years before the breaking out of the rebellion, and that the bonds of the city of Memphis and of the railroad company were at the time of their issue indorsed by the State of Tennessee. The company had its charter from that State, and its road was partly in Tennessee and partly in Georgia. Tenn. Stat. 1848, ch. 169. Under the discretion allowed to a guardian or trustee by the law of Georgia and of Alabama, he was not precluded from investing the funds in his hands in bonds of a railroad

corporation, indorsed by the State by which it was chartered, or in bonds of a city. As Lamar, in making these investments, appears to have used due care and prudence, having regard to the best pecuniary interests of his wards, the sum so invested should be credited to him in this case, unless, as suggested at the argument, the requisite allowance has already been made in the final decree of the Circuit Court in the suit brought by the representative of the other ward, an appeal from which was dismissed by this court for want of jurisdiction in 104 U. S. 465.

2. Other moneys of the wards in Lamar's hands, arising either from dividends which he had received on their behalf, or from interest with which he charged himself upon sums not invested, were used in the purchase of bonds of the Confederate States, and of the State of Alabama.

The investment in bonds of the Confederate States was clearly unlawful, and no legislative act or judicial decree or decision of any State could justify it. The so-called Confederate government was in no sense a lawful government, but was a mere government of force, having its origin and foundation in rebellion against the United States. The notes and bonds issued in its name and for its support had no legal value as money or property, except by agreement or acceptance of parties capable of contracting with each other, and can never be regarded by a court sitting under the authority of the United States as securities in which trust funds might be lawfully invested. *Thorington* v. *Smith*, 8 Wall. 1; *Head* v. *Starke*, Chase, 312; *Horn* v. *Lockhart*, 17 Wall. 570; *Confederate Note Case*, 19 Wall. 548; *Sprott* v. *United States*, 20 Wall. 459; *Fretz* v. *Stover*, 22 Wall. 198; *Alexander* v. *Bryan*, 110 U. S. 414. An infant has no capacity, by contract with his guardian, or by assent to his unlawful acts, to affect his own rights. The case is governed in this particular by the decision in *Horn* v. *Lockhart*, in which it was held that an executor was not discharged from his liability to legatees by having invested funds, pursuant to a statute of the State, and with the approval of the probate court by which he had been appointed, in bonds of the Confederate States, which became worthless in his hands.

Neither the date nor the purpose of the issue of the bonds of the State of Alabama is shown, and it is unnecessary to consider the lawfulness of the investment in those bonds, because Lamar appears to have sold them for as much as he had paid for them; and to have invested the proceeds in additional Confederate States bonds, and for the amount thereby lost to the estate he was accountable.

3. The stock in the Mechanics' Bank of Georgia, which had belonged to William W. Sims in his lifetime, and stood on the books of the bank in the name of his administratrix, and of which one-third belonged to her as his widow, and one-third to each of the infants, never came into Lamar's possession; and upon a request made by him, the very next month after his appointment, the bank refused to transfer to him any part of it. He did receive and account for the dividends; and he could not, under the law of Georgia concerning foreign guardians, have obtained possession of property of his wards within that State without the consent of the ordinary. Code of 1861, §§ 1834–1839. The attempt to charge him for the value of the principal of the stock must fail for two reasons: First. This very stock had not only belonged to the father of the wards in his lifetime, but it was such stock as a guardian or trustee might properly invest in by the law of Georgia. Second. No reason is shown why this stock, being in Georgia, the domicil of the wards, should have been transferred to a guardian who had been appointed in New York during their temporary residence there.

The same reasons are conclusive against charging him with the value of the bank stock in Georgia, which was owned by Mrs. Abercrombie in her own right, and to which Mr. Abercrombie became entitled upon her death. It is therefore unnecessary to consider whether there is sufficient evidence of an immediate surrender by him of her interest to her children.

The result is, that

*Both the decrees of the Circuit Court in this case must be reversed, and the case remanded for further proceedings in conformity with this opinion.*