### In re REID.

District Court, D. Oregon.
May 3, 1934.

V. C. Tomlinson, Naturalization Examiner, for the United States.

JAMES ALGER FEE, District Judge (after stating the facts as above).

Petitioner claims the right to restoration of citizenship by virtue of an act of Congress permitting "a woman who has lost her United States citizenship by reason of her marriage to an alien eligible to citizenship" to be naturalized "if eligible to citizenship and if she has not acquired any other nationality by affirmative act." Tit. 8 USCA § 369.

Mrs. Reid is eligible for citizenship. Her good character is proved. She was born in this country, is attached to the principles of the Constitution of the United States, and intends permanently to reside in this country. Her husband is eligible to citizenship. See Gorman v. Forty-Second St. M. & St. N. Ave. R. Co., 208 App. Div. 214, 203 N. Y. S. 632. She did not acquire any other nationality by affirmative act.

The government admits that there has been no choice of Canadian allegiance by petitioner, either based upon evidence of her residence or marriage to a citizen of that country, and the court so finds. The sole basis of the attempt to prevent petitioner from reclaiming her native allegiance in accordance with the strict letter, of the congressional enactment is the contention that the terms of the statute do not apply to her, since she had already lost her citizenship by the naturalization of her father in Canada while she was still a minor. This construction is narrow and technical in view of the tenor of the other acts of the Congress favoring repatriation of the native born. 8 USCA §§ 369a, 372a.

If the instant proceeding, however, had the simple result of denying citizenship to petitioner alone, the court might not hold that the result demanded by the bureaus of the government is inequitable. When the exclusion of petitioner is sought, on the other hand, not upon the ground that she had made choice of Canadian citizenship by continued residence, not upon the ground that her marriage showed a preference for that country to her native land, but upon principles which transcend the incidents of isolated cases, and open the road to involuntary exile of native-

born citizens of the United States, the rights guaranteed by our basal law to a person born in this country must be reaffirmed.

The argument for the government proceeds upon the ground that by the terms of the Naturalization Treaty between the United States and Great Britain, proclaimed September 16, 1870, 16 Stat. 775, the United States are required to treat all persons naturalized in the British dominions "in all respects and for all purposes" as British subjects. Since the laws of Canada at that time in force conferred citizenship in that country upon all minors whose fathers were naturalized there, it is urged petitioner could not be accorded rights of citizenship by the United States without violation of the treaty.

This result is demanded neither by the statute nor the treaty. The enactment, Rev. Stat. of Canada, 1906, c. 77, reads: "If the father or the mother, being a widow, has obtained a certificate of naturalization within Canada, every child of such father or mother who, during infancy, has become resident with such father or mother within Canada, shall, *within Canada*, be deemed to be a naturalized British subject."

Clearly the limitation "within Canada" indicates an intention to permit the minor to resume his native allegiance in the country of his birth. This deduction appears more logical when it is considered that, by a subsequent statute, the right of a minor to select, in accordance with the principles of international law, between citizenship in Canada and the country of his birth, is affirmed. Statutes of Canada, 1914, c. 44, § 5. But the court is reminded, Rev. Stat. of Canada, 1886, c. 113, § 15, provides that a naturalized alien shall not be deemed to be a British subject "when within the limits of the foreign state to which he was a subject * * * unless he has ceased to be a subject of that state in pursuance to the laws thereof, or in pursuance of a treaty or statute to that effect." In answer, it may be said that this proviso does not apply. No law of this country broke the tie of citizenship by birth when Mrs. Reid was naturalized in Canada by her father's act. Nor does the treaty require such a termination of her rights.

The compact itself contains no language which expressly destroys citizenship in the United States of a person naturalized in the British dominions, nor specifically does it attempt to forbid the exercise of the option of a minor at maturity between the country of his birth and the country in which, without his concurrence, he may have been natural-

ized. The document, by article III, expressly permits in the broadest terms the United States to repatriate nationals who may have been naturalized in the British dominions. Since Mrs. Reid is in this country voluntarily seeking citizenship, the United States may restore her rights on any terms which may be deemed proper without violation of its terms.

The history of our relations with England and the language of this document show that the intent was to establish between the governments the right of expatriation to the citizens of either, and to prevent the imperative imposition of obligations of citizenship by either, upon persons who had renounced allegiance to that country. The treaty places restrictions upon governmental action in imposing burdens upon a former citizen. (See construction of a similar treaty with Bavaria, Mr. Wharton to Mr. Phelps, March 26, 1891, For. Rel. 1891, 507.) On the other hand, it permits the other government to confer benefits of citizenship to any person seeking them. The municipal law is, as to this, established as supreme by the compact. The rights of the person who claims citizenship are therefore unfettered by the treaty.

The salient error in the proposed construction of this document by the government is the theory that by naturalization in Canada a minor born in this country loses his citizenship in the United States. The government must insist upon this interpretation or it cannot prevail, because, if citizenship in the United States was not erased by the naturalization of petitioner as a minor, it was "lost" under the terms of the congressional statute by her marriage to Reid. But, during the history of this country, no attempt has been made to cede to an alien power the allegiance of any citizen without an act of expatriation upon his own part.

On the other hand, the law of this country enforced since the inception of the government endowed Mrs. Reid with citizenship here, and from it she could not be divorced except by her own free will. No treaty can accomplish such a result because either of its inherent force or its adoption of foreign municipal law.

At common law and under the early judicial determinations in the United States it was established that birth in a country conferred citizenship. Even under that teaching, although there was no constitutional declaration conferring the right, judicial expression upheld citizenship as inviolable from governmental interference, without volun-

tary action by the party concerned. "No act of legislation can denationalize a citizen without his concurrence." Burkett v. Mc-Carty, 73 Ky. (10 Bush) 758. The sovereign cannot discharge the subject from his allegiance against his consent except by disfranchisement as a punishment for crime. Ainslie v. Marlin, 9 Mass. 454, 461. "The constitution does not authorize congress to enlarge or abridge those rights [the rights of citizens]." Osborn v. Bank of U. S., 9 Wheat. 738, 827, 6 L. Ed. 204. Thereafter the right of citizens by birth was confirmed by the Constitution. Section 1, Amendment 14, to that instrument provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States. * * * " The history of the amendment need not be reviewed to prove that it contains a prohibition against the disfranchisement, denaturalization, or exile of a native-born person without voluntary action by him. That is axiomatic.

■ Although the treaty as properly interpreted does not debar petitioner, it could not in any event prevent Mrs. Reid, therefore, from claiming the privileges and immunities with which she was invested by common law, and by the express terms of the amendment. For, although the treaty making power extends to all subjects which are proper for negotiation between nations, "it would not be contended that it extends so far as to authorize what the Constitution forbids." Geofroy v. Riggs, 133 U. S. 258, 267, 10 S. Ct. 295, 33 L. Ed. 642.

This limitation is brushed aside by the one case squarely in point. Ostby v. Salmon, 177 Minn. 289, 225 N. W. 158. It holds that, where a minor born in the United States was taken to Canada, of which country, while he was under age, his father became a naturalized citizen and he returned to the United States during minority, he could not resume his native allegiance at majority. Emphasis is placed upon the rights and duties of respective governments under the treaty. The theory of dual allegiance is summarily dismissed, and the doctrine of election is not in terms mentioned at all. The underlying theory of the ruling appears to be upon the ground of convenience of the governments involved and the election officials. The method used by the court seems empirical. But the reasoning of the opinion does not yield to the distinction that the instant case is one concerned with the formalities of naturalization, while that dealt with the right to vote

without naturalization. Since repatriation by formal act is mentioned therein as the remedy, a diverse result might here be consistent, even if the exigencies of governmental action alone be considered.

This decision cannot be squared with the terms of the amendment as interpreted in the light of its history by the Supreme Court of the United States. In U. S. v. Wong Kim Ark, 169 U. S. 649, 703, 18 S. Ct. 456, 478, 42 L. Ed. 890, the court held that, notwithstanding national policy and express enactment of Congress required exclusion of the Chinese race, one of its members could not be deprived of his birthright as a citizen of the United States. The history of the Fourteenth Amendment therefore, and its purpose as declared by the courts, void any governmental action denaturalizing a citizen without action unimposed upon him. Unquestionably this principle prevents the forfeiture of citizenship by peremptory conditions imposed after birth. "The fourteenth amendment * * * has conferred no authority upon congress to restrict the effect of birth, declared by the constitution to constitute a sufficient and complete right to citizenship." U. S. v. Wong Kim Ark, supra. If it were otherwise, members of minority parties might be declared denationalized on account of their doctrines, and other limitations might be set, the effect of which would be to destroy the citizenship conferred by the Constitution.

The right of voluntary expatriation granted to citizens of this country in accordance with "the fundamental principles of the Republic" and obtained for the subjects of other powers by enlightened policy is a doctrine of liberty. The right of two governments to bargain away the allegiance of an individual without action of his own accord is a doctrine of absolutism and inconsistent with the primary law of the United States.

A different ground for upholding the denaturalization of a native-born citizen without consent is that the municipal law of the foreign country declared that the person was a citizen thereof and the United States were bound by treaty to respect the declaration.

In Citizenship of Ingrid Therese Tobiassen, 36 Op. Attys. Gen. 535, is a letter to the Secretary of Labor, in which the Attorney General held that a minor who was born in the United States and whose father, after becoming a citizen of the United States by naturalization, took her to Norway, his native country, where he established a permanent residence, acquired Norwegian nationality

through the reacquisition by her father of his rights as a Norwegian subject, and therefore she ceased to be an American citizen, notwithstanding the fact that she returned to this country when she attained majority, established a permanent residence, and attempted to claim citizenship in the country of her birth.

The interesting feature of this letter is that it does not mention the paramount right of a native-born citizen under the Fourteenth Amendment. It likewise dismisses without consideration the limitations upon the treaty-making power suggested by the Secretary of Labor. It assumes without discussion that the acquisition of an alien citizenship by a minor of its own force divests his native citizenship, which does not follow according to the principles of international law. It does not mention the doctrine of election. It bases the determination upon the fact that imperative imposition of Norwegian citizenship upon a person destroys his previous nationality. Finally it assumes that the convenience of the governments involved is the transcendent consideration and that the rights guaranteed to native-born citizens are of no consequence. The recent opinion of the Attorney General, In re Citizenship of Mrs. Marie Thorgaard, August 3, 1933, seems to reflect a more liberal disposition, although the questions here discussed are expressly held not to be in point.

But, if a construction given to a treaty by reference to the municipal laws of a foreign country overrides constitutional limitations, a result is accomplished indirectly which could not be brought about directly. The Department of State has always contended that a mandate by a foreign country imposing citizenship therein upon a citizen of the United States could not destroy his rights to the protection of this country on the ground that "transfer of allegiance must be by a distinctly voluntary act." Mr. Bayard to Mr. Manning, November 20, 1886, For. Rel. 1886, p. 723; The Boisseliers, infra. See, also, Moore Int. Arbitrations, vol. 3, 2479–2482. Where a son was born in Alsace-Lorraine to a naturalized citizen of this country, and was claimed as a German citizen by virtue of the treaty of 1871, it was said: "The American citizenship inherited by Mr. George and elected by him when of full age cannot be divested, either by the municipal laws of Germany nor by a treaty between Germany and France." For. Rel. 1886, pp. 317, 327.

It may be taken as settled that no municipal law of a foreign country can, by imposing involuntary citizenship, thereby deprive a citizen of this country of his rights, and that no governmental agency by virtue of the treaty power can divest a native-born citizen of the privileges and immunities without his affirmative action, either as a direct or indirect result of the foreign law. The question is whether petitioner's rights fall within these protections.

With these limitations in mind then, a review of the rights conferred upon the minor by international law and under decisions of the courts will tend to clarity, and determine whether the destruction of American citizenship by treaty or foreign law is an unwarranted assumption, or is in accordance with the power conferred by the Constitution, for, in order to prevent application of the supremacy of treaty obligations over the rights of citizens from becoming exemplifications of untrammelled power, it is imperative that such instances be confined to cases for which there is historical and logical warrant. The doctrine of dual nationality is applicable where a father emigrates and acquires a new allegiance. Moore, International Law Dig. vol. 3, p. 518. While in a foreign country and a minor, the child of a father naturalized there takes the nationality and domicile of the latter, and is governed by the municipal laws of that country. For practical purposes in accordance with the phraseology of the statute under consideration, he is deemed a citizen of the foreign country. Moore, Int. Law. Dig. vol. 3, pp. 541, 542. But his citizenship in the United States is not thereby impaired or lost. Moore, Int. Law. Dig. vol. 3, pp. 539, 540. At maturity the person thus endowed has the right, and it is his duty to make a decision as to which of the two sovereignties he will accept. The choice is final, and thereafter he owes no allegiance to the country which he has rejected.

In Boyd v. Thayer, 143 U. S. 135, 12 S. Ct. 375, 36 L. Ed. 103, it was recognized that there was a dual nationality in the minor son of an alien, where the latter had filed a simple declaration of intention to become a citizen here, and the right of the former to make an election at majority was affirmed.

Inasmuch as birth in a country confers the strongest claim to citizenship there, the universally recognized right of a child born in a foreign country of American parents to claim citizenship here by election at majority is a cogent argument for permitting like election where a child is born here and by the act of the parent becomes endowed with rights of citizenship in a foreign country. Under

both common and international law, birth in a country confers rights of citizenship. Forfeiture of such right can only be by voluntary act of the citizen. The right to citizenship by virtue of the naturalization of the father, on the other hand, can only be conferred by special municipal law. This country through the State Department has always recognized the right of a person born abroad of a father who is a citizen of the United States to claim allegiance to and protection of this country when he arrives at majority, although there is not a syllable in the fundamental law which confers such power upon him. Mr. Bayard to Mr. Pendleton, April 27, 1886, For. Rel. 1886, p. 327; Mr. Seward to Mr. Foster July 2, 1879, For. Rel. 1879, p. 815; Case of Hine, For. Rel. 1901, p. 421; Mr. Seward to Mr. Foster, Aug. 13, 1879, For. Rel. 1879, p. 825. The only reason no specific statute has been passed conferring such power upon the minor born in this country is that his rights are guaranteed by the Constitution itself. Where a child was born in Canada and lived there for a considerable time, but claimed American citizenship of his father, it is said: "The citizenship acquired by Samuel Nelson Jackson at birth was a qualified one, and of that peculiar character under the law which required an election on his part upon attaining his majority or within a reasonable time thereafter whether he would conserve the citizenship of the United States or that of Canada. This election, when once made, is binding upon him and the country of his choice. * * * His son, S. Hollister, * * * was born in Canada in 1875, born into that same kind of American citizenship which required an election on his part as it had of his father." State of Vermont ex rel. Chas. A. Phelps v. S. Hollister Jackson, 79 Vt. 504, 65 A. 657, 661, 8 L. R. A. (N. S.) 1245.

A like determination is found in Ludlam v. Ludlam, 26 N. Y. 356, 84 Am. Dec. 193. The specific question, however, is whether the parents of a minor have the power to destroy his rights to the privileges and immunities of citizenship in the United States to which he is entitled by birth. It would seem that the denial of the right to the minor himself is a cogent argument against the existence of such a right in any other person. It was early recognized in this country that a minor has no right of his own accord to expatriate himself and is "totally incapable of making any election in regard to his citizenship." Ludlam v. Ludlam, 26 N. Y. 356, 376, 84 Am. Dec. 193. This limitation has been re-affirmed recently in U. S. ex rel. Baglivo v. Day (D. C.) 28 F.(2d) 44, where it is said: "A native-born citizen [of the United States], who has not attained the age of 21 years, cannot renounce allegiance to the United States."

The question of the right of the parent was raised but not determined in U. S. v. Wong Kim Ark, 169 U. S. 649, 705, 18 S. Ct. 456, 478, 42 L. Ed. 890, where the court says: "No doubt he might himself, after coming of age, renounce this citizenship, and become a citizen of the country of his parents, or of any other country. * * * Whether any act of himself, or of his parents, during his minority, could have the same effect, is at least doubtful."

In the case of Steinkauler, 15 Op. Attys. Gen. 17, it is said: "Young Steinkauler is a native-born American citizen. There is no law of the United States under which his father or any other person can deprive him of his birthright."

In that case the minor was by jus sanguinis a subject of the German Empire.

Another expression of this sort is found in Ex parte Chin King (C. C.) 35 F. 354, 356, where it is said: "However, in my judgment, a father cannot deprive his minor child of the status of American citizenship, impressed upon it by the circumstances of its birth under the constitution and within the jurisdiction of the United States. This status, once acquired, can only be lost or changed by the act of the party when arrived at majority, and the consent of the government."

The United States have strenuously insisted upon the application of this principle and apparently with success in cases where obligations of its citizens by personal adoption were demanded by an alien government. Particular emphasis was placed upon right of a person of dual nationality to cast his lot with this country, where, at the time of the controversy, the person who had chosen allegiance to the United States, the country of his birth as against the country of his father's nativity, domicile and citizenship, was within the territorial limits of the former. Mr. Evarts, Secretary of State, writing to Mr. White, Minister to Germany, referring to two persons born in this country to a naturalized citizen of this country, and who had been taken then to the country of the father's nativity, but who returned before majority and preferred allegiance to the United States, uttered a ringing declaration, in which he said with reference to the constitutional guaranty:

"It is quite clear that the two young Boisseliers, being native born citizens of the United States, and now subject to the jurisdiction of the United States, cannot be held under any law, municipal or public, to owe military service to the German Government. Their rights rest on the organic law of the United States. The Constitution declares (Article XIV of the Amendments) 'That all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.' This is the supreme law of the Republic, available alike to all citizens, whether native or naturalized, and binding upon every Department and officer of the Government. The brothers Richard and Caspar Boisselier, in their present political status, fulfil all its conditions. Their father, it is true, took them to Schleswig when they were quite young, one four and the other two years old. They lived there many years, but during all those years they were minors, and during their minority they returned to the United States; and now, when both have attained their majority, they declare for their native allegiance and submit themselves to the jurisdiction of the country where they were born, and of which they are native citizens. Under these circumstances, this Government cannot recognize any claim to their allegiance, or their liability to military service, put forth on the part of Germany, whatever may be the municipal law of Germany under which such claim may be asserted by that Government.

" * * * Whether or not the father, Carl Gerhard Boisselier, may by his continued residence in Schleswig have resumed his original nationality and renounced his American citizenship is a question which I do not now undertake to determine nor is its determination deemed essential to the present question." Moore Int. Law Digest. Vol. III, § 430, p. 543.

This case is exactly in point, except it is now contended a treaty can override the fundamental declaration.

Nor can the fact that the statute under which petitioner forfeited her citizenship by marriage was upheld as constitutional be recognized as establishing an exception. Marriage depends upon an act of volition. Furthermore, the doctrine of loss of citizenship by a woman by marriage to an alien (Madame Berthemy's Case, 12 Op. Attys. Gen. 7; Mr. Frelinghausen, Secy. of State, to Mrs. Walsh, Jan. 31, 1884, Moore, Dig. Int. Law, 5408) and repatriation after coverture has ended finds explicit warrant in international law (Moore, Dig. Int. Law, 3409). Nor does Mackenzie v. Hare, 239 U. S. 299, 36 S. Ct. 106, 108, 60 L. Ed. 297, Ann. Cas. 1916E, 645, destroy the principle that the consent of the citizen is a prerequisite to denationalization, for it is there said "it may be conceded that a change of citizenship cannot be arbitrarily imposed."

It is thus firmly established in the law of this country and in the law of nations that a minor born in this country who is involuntarily naturalized in a foreign country has a right to elect allegiance when he arrives at maturity, and that he cannot be deprived of that right by his own act nor by the act of his parents, nor by the municipal law of the foreign state. Any attempt by circumlocution to deprive him of the right by the treaty making power would be an arbitrary denaturalization inconsistent with the fundamental law. Before majority, Mrs. Reid thus had a dual nationality and was entitled to the benefits which might flow from either citizenship. Ludlam v. Ludlam, 26 N. Y. 356, 377, 84 Am. Dec. 193.

Nor is it in accordance with sound national policy as expressed in the statutes to prevent native-born citizens from repatriation. These children who are raised in a foreign country and disregard alien influences and parental authority at majority to seek allegiance to their native country have proved their belief in the inherent soundness of its institutions. When it is considered that the consequence of a contrary view might, by an extension of the quota acts, amount to virtual exile, that doctrine cannot be too strongly condemned.

■ The petitioner was a citizen not only by jus soli but also by jus sanguinis, since she was born in this country of native parents. This right she lost by marriage to an alien and not by other affirmative act. The statute confers her a right by express terms to repatriation.

The petitioner is admitted to citizenship.