**PERKINS, Secretary of Labor, et al. v. ELG.** [*]

**ELG v. PERKINS, Secretary of Labor, et al.**

**Nos. 7096, 7097.**

United States Court of Appeals for the District of Columbia.

Argued June 14, 1938.

Decided Aug. 1, 1938.

[*] Writ of certiorari granted 59 S.Ct. 245, 83 L.Ed. —.

David A. Pine, U. S. Atty., and John H. Mitchell, Asst. U. S. Atty., both of Washington, D. C., for Frances Perkins and another.

Henry F. Butler, of Washington, D. C., for Marie E. Elg.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

GRONER, C. J.

The main question in this case is whether appellee, a natural born citizen of the United States, has lost her citizenship involuntarily and by operation of law, by reason of her removal from the United States by her parents in her infancy and her residence in a foreign country until she was 21 years of age.

A secondary question is whether the suit is properly brought under the Declaratory Judgment Act, 28 U.S.C.A. 400.

The facts are these: Marie Elizabeth Elg was born October 2, 1907, in the city and state of New York, and at the time of bringing this suit was and now is a resident of Mt. Kisco, Westchester County, New York. Some years prior to her birth her parents emigrated from Sweden to the United States, and in September 1906 her father was naturalized in ⸴New York. In 1911, when four years of age, Miss Elg was taken by her mother to Sweden, where she resided until she was 21 years of age. Her father remained in the United States until 1922, at which time he too returned to Sweden, where he has lived ever since. Shortly before she attained, her majority Miss Elg inquired of an American consul in Sweden what steps she should take when she reached legal age to return to the United States as an American citizen. As the result of this inquiry the Secretary of State of the United States issued instructions to the consul at Göteborg in Sweden to furnish Miss Elg an American citizen's passport, and in 1929 when 21 years of age, Miss Elg returned to the United States and was admitted at the port of New York as a natural born citizen of the United States. In April 1934,—because investigation of her father's status by American consular officials developed the fact that he had no intention of returning to the United States and was willing to surrender his naturalization certificate,—Miss Elg was examined by the immigration service in New York; and in April 1935 she was notified that she was an alien illegally in the United States, and was ordered to leave the country and threatened with deportation if she did not. As the result of her protest, the Secretary of Labor and the Commissioner of Immigration, as a matter of grace, suspended action temporarily, but all the while insisting upon the validity of the holding that she was an alien illegally in the United States and all the while threatening to have her deported. In July 1936 Miss Elg applied to the Secretary of State for an American passport, which the Secretary refused on the ground that, because of the residence of her father in Sweden since 1922 without the intention of returning to the United States, the Department considered that he had renounced his American citizenship and reacquired Swedish nationality, and that because of her residence with her father she too had lost the one and acquired the other.

In January 1937 Miss Elg brought her suit in the United States District Court in the District of Columbia against the Secretary of Labor, the Commissioner of Immigration, and the Secretary of State. She prayed for a judgment declaring that she is, a natural born citizen of the United States and entitled to all the rights and privileges of a citizen; and she prayed further that the Secretary of Labor and the Commissioner of Immigration be enjoined from carrying out the threat to deport her from the United States or

from interfering with her residence therein; that the Secretary of State be enjoined from officially holding her not to be a citizen of the United States and refusing to issue her a passport; and for general relief. A show cause order was issued, and the case was heard on the return thereto and on a motion to dismiss the bill. The court held that plaintiff had not lost her American citizenship by her residence abroad during her minority; that when she elected to return and did return to the United States immediately after her emancipation she was entitled to be treated as a citizen of the United States; and that the deportation proceedings begun against her and suspended only by her suit, presented an actual controversy entitling her to a declaratory judgment. The court dismissed the bill as to the Secretary of State on the ground that the issuance of a passport involved discretion, but refused to dismiss as to the Secretary of Labor and the Commissioner of Immigration. All parties elected to stand on their pleadings, and the present cross appeals were duly effected.

We think the decision of the lower court is in all respects correct.

The law of England, as of the time of the Declaration of Independence, was that a person born in that kingdom owed to the sovereign allegiance which could not be renounced. Many early American decisions applied that as the common law in this country. All agreed that every free person born within the limits and the allegiance of a State of the United States was a natural born citizen of the State and of the United States. And this was undoubtedly the view of Mr. Justice Curtis in his dissenting opinion in the Dred Scott Case, 19 How. 393, 581, 15 L.Ed. 691, in which he said:

" * * * we find that the Constitution has recognised the general principle of public law, that allegiance and citizenship depend on the place of birth."

This doctrine of citizenship by reason of place of birth is spoken of by the writers on the subject as the jus soli or common law doctrine. The Roman rule is different and is in effect in many of the continental European countries. This is called the jus sanguinis and depends upon the nationality of the parents and not upon the place of birth. Professor Bluntschild, in speaking of the latter doctrine, said:

"The bond of the family lies at the foundation of national and political life, and attaches the child to the people among whom he is born. The opinion that fixes upon the locality of nativity, instead of the personal tie of the family, as the cause of nationality, abases the person to be a dependence of the soil."[1]

But this was not the common law.[2] United States v. Wong Kim Ark, 169 U. S. 649, 18 S.Ct. 456, 42 L.Ed. 890. When the Constitution was adopted the people of the United States were the citizens of the several States for whom and for whose posterity the government was established. Each of them was a citizen of the United States at the adoption of the Constitution, and all free persons thereafter born within one of the several States became by birth citizens of the State and of the United States.[3]

The first attempt by Congress to define citizenship was in 1866 in the passage of the Civil Rights Act (Rev.St. § 1992, 8 U.S.C.A. § 1). The act provided that:

"All persons born in the United States and not subject to any foreign power are declared to be citizens of the United States."

And this in turn was followed in 1868 by the adoption of the Fourteenth Amendment, U.S.C.A.Const. Amend. 14, declaring:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

[1] Article 2, Rev. de droit Int. & leg. Compaie. See also Dr. Arnolds' (of Rugby) Mis. writings, art. Christian policies, p. 465; 1 Gibbon 45—2 Ibid. 158.

[2] Both England and the United States (Act of 25 Ed. III Stat. 2, passed in 1350, and Act of April 14, 1802, R.S. § 1993, 8 U.S.C.A. § 6) under some circumstances recognized citizenship on the part of children of subjects or citizens born out of the jurisdiction of the respective countries.

[3] Mr. Calhoun in his published work upon the Constitution denied that there was any citizenship of the United States in any other sense than as being connected with the government through the States.

■ As a result of the adoption of the amendment, whatever differences existed between statesmen and jurists on the general subject prior to the War Between the States was put to rest, and it may now be stated as an established rule that every person born within the United States (except in the case of children of ambassadors, etc.), whether born of parents who are themselves citizens of the United States or of foreign parents, is a citizen of the United States. In the Wong Kim Ark Case, supra, the whole question of citizenship is traced from its source and the subject is so elaborately considered as to make unnecessary any further reference to this phase of the question. But see generally on the subject: McCreery v. Somerville, 9 Wheat. 354, 6 L.Ed. 109; In re Look Tin Sing, C.C., 21 F. 905; Ex parte Chin King, C.C., 35 F. 354; Gee Fook Sing v. U. S., 9 Cir., 49 F. 146; Lynch v. Clarke, 1 Sandf. Ch., N.Y., 583; Opinion of Attorney General Black in 1859, 9 Op. Attys. Gen. 373; Opinion of Attorney General Bates in 1862, 10 Op. Attys. Gen. 394.

And this brings us to the second branch of the question, that is, whether appellee through the act of her parents has lost the rights of citizenship which she acquired at her birth. The question is not new. In circumstances such as these Attorneys General have for nearly a hundred years, and almost unanimously, answered it in the negative; and their views are supported by the decisions of many courts.

■ In this case it is agreed that appellee has done no act of her own showing an intention to surrender or forfeit her rights as a citizen of the United States. To the contrary, it is recognized that immediately upon her emancipation, she asserted them, and after the recognition of them by the United States returned to this country. If, in spite of this, she has lost those rights, it must be because she became by operation of Swedish law a naturalized citizen of Sweden upon her father's repatriation there, and in consequence ceased, also by operation of law, to be a natural born American citizen.

We think there is a conclusive answer to this proposition.

The Swedish law, it is agreed by both sides, is found in paragraph 3 of Article VIII of the Citizenship Act of Sweden of 1894. The parties, however, differ in the translation of the paragraph. Appellee insists that, rendered in English, it reads as follows:

"If Swedish citizenship is recovered by a * * * father Swedish citizenship shall also accrue to his * * * children who are under age, unless * * * they are not resident in Sweden at the time when the * * * father recovers Swedish citizenship or have not lost along with him citizenship in the foreign country."

As rendered by appellants, it reads:

"If * * * Swedish right of citizenship has been regained by the * * * father, such right also accrues to his * * * children under age, unless * * * they neither are domiciled in this country when citizenship is regained by the * * * father, nor have lost their citizenship in the foreign country together with him."

The parties likewise differ as to the interpretation of the paragraph. Appellee insists it means that two conditions must concur to confer Swedish citizenship on the infant—the infant must be with his father and the law of the country of his birth must have expatriated him upon his father's resumption of Swedish citizenship. Appellants insist that the conditions in the paragraph must be read in the alternative and, so read, must be taken to confer Swedish citizenship on the infant either in the event of his being in Sweden or in the event of his losing his citizenship upon his father's repatriation. Relying upon this latter reading of the paragraph, appellants say that by virtue of the express terms of Section 2 of the Act of March 2, 1907 (8 U.S.C.A. § 17),—which provides that any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws,—appellee was at no time after two years from the date of her father's return to Sweden a citizen of the United States. But in the view we take of the main question, it is not necessary to determine the meaning or effect of the Swedish statute. For, even granting the interpretation insisted on by appellants, we think the argument based upon it goes too far. If we concede that under Swedish law appellee became a naturalized Swedish citizen during her minority residence in that country, we should have only what is well known in international law as double

citizenship, and whatever effect that status might have on appellee's right to call on the United States for protection[4] while she remained abroad, it would not affect her right of election when she reached her majority to claim and resume her American citizenship and return to the United States. Or, stated differently, even if we assume that a naturalized American citizen by abandoning his residence in this country and by returning to the country of his birth animo manendi, ceases to be a citizen of the United States and that his minor child born in the United States partakes during his legal infancy of his father's restored nationality, such child nevertheless, upon becoming sui juris, has the right to elect to retain his American citizenship,—and such election, which is best evidenced by a return to the United States, restores his original status as a citizen of the United States. This was the view expressed by Secretary Bayard in a letter to Mr. Liebermann on July 9, 1886,[5] and grows out of the well recognized doctrine that expatriation is a matter of intent on the part of the person concerned, which intent must be shown by some express act or some other act from which it can be gathered.[6]

The record in this case is wholly lacking in any showing of intent, actual or presumptive, on the part of appellee at any time to abandon American citizenship and, lacking such showing, what was said by Attorney General Pierrepont in Steinkauler's Case, 15 Op. Attys. Gen. 15, is true here, that:

"There is no law of the United States under which his father or any other person can deprive him of his birthright. He can return to America at the age of twenty-one, and in due time, if the people elect, he can become President of the United States * * *."

Like opinions were expressed by Secretary Olney on May 29, 1896, in a letter to Mr. Materne, by Secretary Frelinghuysen in 1882, and by Mr. Blaine in 1892. These and many other instances of the application of the rule to a state of facts like those in the present case are to be found in Moore's Digest of International Law, Vol. 3, p. 532, et seq. And the rule is summarized in the statement of Mr. Uhl, acting Secretary of State, in a letter to Mr. Rudolph of May 22, 1895, as follows:

" * * * no principle is better settled than that birth in the United States, irrespective of the nationality of the parents, confers American citizenship. The right of election of nationality, which it is generally conceded a person born under such circumstances has, cannot be exercised until he attains his majority. The father cannot by any act of his alter the status conferred upon the son by his birth in this country."

This was also the conclusion of Judge Hough in United States v. Husband, 2 Cir., 6 F.2d 957, where, quoting from Secretary Bayard, he said (page 958):

"It has been repeatedly held by us that, when a person born in the United States arrives at 21 in a foreign country, the mode of expressing his election to be a citizen of the United States is by promptly returning to the United States. * * * That is what is called double allegiance, and by the law of nations the nationality of such persons is to be determined by their own election' of nationality at their maturity, which election is evidenced by placing themselves in the country they elect."

See, also, to the same effect, United States v. Day, Com'r of Immigration, D.C., 28 F.2d 44; State ex rel. Phelps v. Jackson, 79 Vt. 504, 65 A. 657, 8 L.R.A., N.S., 1245. This result necessarily follows from the fundamental rule that a natural born citizen of the United States retains his citizenship until he changes it himself in due form and voluntarily becomes a citizen of some other country. Morse, Citizenship by Birth, etc., p. 239. The change can neither be worked by the father nor by the sovereignty into which the child involuntarily is taken, for under the English and American doctrine the child himself acquires rights and owes fealty besides that which attaches to the father. Wong Kim Ark Case, page 691,

---

[4] Much confusion has resulted from the failure to distinguish between cases involving the question whether a citizen is entitled to protection abroad and cases involving per se the question of citizenship.

[5] Moore's Digest of International Law, p. 542.

[6] Van Dyne, Citizenship of the U. S. (1904), p. 275.

18 S.Ct. 456. In the instant case neither the Act of March 2, 1907, 34 Stat. 1228, nor any other statute has taken away or diminished those rights, and it is doubtful, indeed, if there is any power in Congress,—in view of the provisions of the Fourteenth Amendment, U.S.C.A.Const. Amend. 14—to take them away. On this subject the Supreme Court in the Wong Kim Ark Case said, page 703, 18 S.Ct. page 477:

"Congress having no power to abridge the rights conferred by the constitution upon those who have become naturalized citizens by virtue of acts of congress, a fortiori no act or omission of congress, as to providing for the naturalization of parents or children of a particular race, can affect citizenship acquired as a birthright, by virtue of the constitution itself, without any aid of legislation. The fourteenth amendment [U.S.C.A.Const.Amend. 14], while it leaves the power, where it was before, in congress, to regulate naturalization, has conferred no authority upon congress to restrict the effect of birth, declared by the constitution to constitute a sufficient and complete right to citizenship."

We are, therefore, of opinion that when in 1929, upon a full disclosure of all the facts set out herein,—as the bill declares was the case,—the State Department of the United States issued to appellee a passport to return to the United States as an American citizen, it acted properly and in accordance with the law. In our opinion appellee is a natural born American citizen whose right to all the privileges of citizenship,—whether or not, as far as concerns diplomatic protection, it be considered as suspended during her minority and sojourn in a foreign country,—was in full effect when on her majority she applied for and received her passport. We are, therefore, of opinion that she was properly admitted into this country and, as the lower court held, is entitled now to be free of molestation.

We have carefully examined the opinion of the Attorney General in Tobiassen's Case, 36 Op. Attys. Gen. 535,[7] and the case of United States v. Reid, 9 Cir., 73 F.2d 153,[8] certiorari denied on the sole ground that the petition was not filed in time 299 U.S. 544, 57 S.Ct. 44, 81 L.Ed. 400, upon which appellants rely; and we think that the arguments they make out are not supported by the statute on which they are mainly built,[9] and likewise that the conclusions reached are opposed to the established rules and principles which, it seems to us, not only should apply but since the adoption of the Constitution have been applied.

And this brings us to the final question in the case, namely, whether the Declaratory Judgment Act, 28 U.S.C.A. § 400, is applicable.

The trial court, as we have seen, concluded that the case was properly brought within the declaratory judgment statute. We are of the same opinion.

There can be no doubt that the lower court had jurisdiction of the several defendants and that it has jurisdiction of the subject matter of the suit. There is no other proceeding at law by which appellee could obtain an adjudication that she is a United States citizen,—certainly none by which she can obtain that adjudication without being subject to arrest and confinement until her case may be heard on a petition of habeas corpus. Appellants, Secretary of Labor and Commissioner of Immigration, are required by law to deport aliens illegally in this coun-

---

[7] The opinion assumes, directly in the teeth of established principles of international law, that the involuntary acquisition of alien citizenship by an American child divests and destroys his native citizenship. In this respect it overlooks the principle of double citizenship (Moore, Vol. 3, p. 518) and the right of election at majority (Moore, p. 541) and see also Boyd v. Thayer, 143 U.S. 135, 178, 12 S.Ct. 375, 36 L.Ed. 103, and it is not supported by any language to be found in the Act of 1907, for that statute by its plain terms contemplates the personal abandonment of allegiance ef-
fected by personal acts. It is universally recognized that an infant cannot change his domicile, Lamar v. Micou, 112 U.S. 452, 470, 5 S.Ct. 221, 28 L.Ed. 751, for in such a matter he has no will of his own; and, as the basis of expatriation is deliberate intention, that quality is wholly lacking where the act is the result of constraint.

[8] See the opinion of Judge Fee in this same case in the District Court, In re Reid, 6 F.Supp. 800.

[9] 8 U.S.C.A. § 17 (presumption statute).

try and in accordance with law they have threatened her with arrest and deportation. The threat remains unretracted and is in abeyance only by agreement of counsel, pending the decision of the case. She has not yet been arrested, and therefore she cannot now test by habeas corpus the question raised here; but she is entitled to a declaration of her political status, for her rights as a citizen are valuable rights, —certainly no less valuable than property rights,—and an actual and vital controversy exists between her and the government in relation to them. The right to be immune from threats of deportation and from the declarations of public officials that she is an alien and subject to arrest is, we think, a right within the declaratory judgment act entitling Miss Elg to prosecute this suit. If she is deported as an alien, her return at all to the United States will be possible only under very difficult conditions. And if the Secretary and Commissioner decide for purposes of their own to postpone her deportation indefinitely, she would, as a publicly declared alien, be subject to entirely different conditions of residence in the United States and to curtailment of the rights and privileges which she might enjoy as a citizen of the United States, such as traveling about freely, demanding and receiving protection from her government, voting, serving as a juror, and holding public office.

We think the facts we have outlined present a case fairly within the intent and purpose of the act whereby appellee may test the validity of the threat and have, as she is entitled to have, a declaratory judgment of her American citizenship. For we certainly have a case "admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged," and in these circumstances the Supreme Court has said the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages. Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000.

The decree of the District Court declaring appellee to be a natural born citizen of the United States is in all respects affirmed.

Affirmed.