**PODEA v. MARSHALL, Secretary of State.**
**Civil Action No. 7479.**

United States District Court
E. D. New York.
Feb. 24, 1949.

John W. Burke, Jr., of New York City, for plaintiff.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Nathan Borock, Asst. U. S. Atty., of Brooklyn, N. Y., of counsel), for defendant.

RAYFIEL, District Judge.

### Pleadings

The plaintiff, in his complaint, alleges that he was born on September 21, 1912, at Youngstown, Ohio, and now maintains a residence in the Eastern District of New York; that on May 13, 1946, he applied for a passport; that his application was denied by the Department of State on the ground that he had lost his American citizenship; that he has neither renounced his American citizenship, nor done anything since his birth to expatriate himself, or otherwise justify the contention of the Department of State that he has lost his American citizenship.

The defendant, in his answer, in substance and effect, pleads a general denial, except that he admits the date and place of plaintiff's birth; he sets up two affirmative defenses: (1) That the plaintiff on or about December 1936, while serving in the Roumanian army, expatriated himself by taking an oath of allegiance to the Roumanian government; and (2) renounced his American citizenship by re-entering into the service of the Roumanian army on or about May, 1941, while a national of the Roumanian government.

### Basis of Action

Plaintiff brings this action under Section 503 of the Nationality Act of 1940, 8 U.S. C.A. § 903, and Amendment 14, Section 1, of the Constitution of the United States, and seeks judgment declaring him to be a national of the United States.

The Nationality Act of 1940, Section 503, provides as follows:

"Judicial proceedings for declaration of United States nationality in event of denial of rights and privileges as national * * *. If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, * * * may institute an action * * * for a judgment declaring him to be a national of the United States. * * * (Oct. 14, 1940, c. 876, Title 1, Subchap. V, § 503, 54 Stat. 1171, 8 U.S.C.A. § 903)."

Amendment 14, Section 1 of the United States Constitution provides as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. * * *"

### Facts

Plaintiff was born in the City of Youngstown, Ohio, on September 21, 1912. His parents were nationals of Austria-Hungary. In June, 1921 (when plaintiff was 8 years old), he was taken by his parents to the Province of Transylvania, then part of greater Roumania, but formerly part of Austria-Hungary. In 1929 (when plaintiff was 17 years old), his parents assumed Roumanian citizenship, and, under Roumanian law, plaintiff became a national of Roumania.

Plaintiff was educated in the primary and secondary schools of Roumania, and was graduated from the University of Cluj with the degree of Doctor of Economics with a license in law.

Plaintiff was domiciled in Roumania continuously from 1921 to 1942, except for a visit he made to the United States in 1939, on an assignment as a newspaper representative at the World's Fair. In connection with this visit, plaintiff travelled as a Roumanian citizen on an American visa.

Under the Recruitment Law of Roumania, all Roumanian nationals between the ages of 18 and 21 years were automatically placed upon the military lists subject to call for induction on their twenty-first birthday for military training. All young men of Roumanian nationality were faced with compulsory military service upon approaching their majority, and that obligation was considered by them in the planning of their careers.

In 1931, when plaintiff was about 19 years old and a student, he applied to the American Consul in Bucharest for a passport to come to the United States, on the ground that he was a native-born American citizen. Plaintiff sought the passport in order to provide himself with proof of his American citizenship, so as thereby to avoid Roumanian military service when he attained his majority. He stated in his application that he wished to return to the United States in one and a half years, but made no mention of the actual purpose for which he desired such passport, viz: avoidance of military service.

He was requested by the American Consul to produce his birth certificate and the affidavits of two persons having personal knowledge of his birth. Many months passed before plaintiff was able to supply the supporting documentary evidence of his American birth, but on December 2, 1933, the American Consul rendered a decision denying said application on the ground that plaintiff had lost his American citizenship and became a Roumanian national by the naturalization of his parents in 1929 (Pltff's Ex. 5).

In 1934 the plaintiff, having attained his majority, received a summons from the Roumanian authorities to report for military service. He made no claim of exemption, pursuant to the provisions of the Recruitment Law, because, lacking an American passport, such a claim would have been futile. It is plaintiff's contention that a denial of his claim of exemption would have subjected him to imprisonment. He submitted to induction, but requested and obtained a deferment until October, 1936, on the ground that he wished to complete his education.

In 1935, during the period of his aforesaid deferment, plaintiff made further inquiry of the American Consul concerning a reconsideration of his passport application. He was advised by letter (Pltff's Ex. 3) that he might have a valid claim to American citizenship provided that he had not taken an oath of allegiance to Roumania or served in the Roumanian army. Thereafter, on April 21, 1936, he submitted a second application for a passport wherein he stated, "I intend to return to the United States to reside permanently within six months, or when I have finished a certain work in connection with my studies."

At this time plaintiff was over 21 years of age and had the status of a Roumanian military inductee, with a deferment. The plaintiff did not formally protest such military service to the American authorities nor was the subject of his military induction mentioned in either the first or second application for a passport.

In October, 1936, plaintiff was inducted into the army, and, together with his entire class of inductees, took an oath of allegiance to Roumania. He served until October, 1937, and was discharged and placed upon the military reserve lists. By reason of his education, he was given a non-commissioned rank, and, by the mere passage of time, in 1939 was advanced to the rank of a commissioned officer.

Plaintiff claims that he made further efforts to obtain a passport after his discharge from the army, but was then told that he was precluded from consideration because of his military service.

It is admitted by the plaintiff that he could have come to the United States during this period as an immigrant, on a visa, but he did not wish to do so.

In 1939, plaintiff obtained a visa based upon a Roumanian passport, and visited the Word's Fair in New York as a repre-

sentative of a Roumanian newspaper. While in the United States he called at the State Department, at Washington, D. C., in connection with his American citizenship status, but all the information he received was to the effect that he could remain in the United States by establishing a lawful entry through another country. Again he refused to accept the status of an immigrant, but preferred to return to Roumania for several reasons. Firstly, he felt that he should complete his newspaper assignment; secondly, he felt that he stood a better chance of clarifying his citizenship status through the American Consul at Bucharest than in the United States; and thirdly, he had certain personal affairs to liquidate in Roumania.

Upon his return to Roumania, he claims that he made further efforts to clear up his status with the American Consul without success.

It is worthy of note at this point that plaintiff admits that during his visit to the Unted States he knew that he was a Reserve Officer in the Roumanian Army, that war in Europe was imminent, and that he would be called up for service in the event of war. Yet, he preferred to return to Roumania.

Although the record does not so state, some time after his return World War II started, and Roumania was occupied by the Germans. It is not clear whether plaintiff went into the Army prior to the spring of 1941. Apparently, the Germans called for military mobilization. At first he ignored registration for service. Eventually, however, in order to improve his position, and through political influence and the use of friends, he obtained entry into the Roumanian army, in or about May, 1941. He served as an officer-correspondent in a campaign in Bessarabia from about June to October, 1941, when the campaign was successfully completed. Thereupon, he was demobilized for thirty days. He did not thereafter return to the army, but continued in the status of a deserter until he left Roumania with the American Legation on an American visa in the early part of 1942.

On December 31, 1941, he married an American citizen attached to the American Consulate in Bucharest. He has remained in the United States since his return.

On or about May 13, 1946, plaintiff applied to the Department of State for a passport to Norway-Sweden-Europe (Pltff's Ex. 8), which was denied upon the ground that he had lost his American citizenship (Pltff's Ex. 9).

On the basis of such denial plaintiff brought this action for a judgment declaring him to be an American citizen.

## Law

■ It is a long recognized and well established principle that plaintiff acquired American citizenship upon his birth on September 21, 1912, at Youngstown, Ohio, even though his parents were immigrant aliens. Fourteenth Amendment, Section 1; United States v. Wong Kimm Ark, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890; Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320. And it is equally well established in our law that the plaintiff, while an infant could not divest himself of such citizenship, whether by his own acts, or the acts of his parents. In re Reid, D.C., 6 F.Supp. 800, 805; McCampbell v. McCampbell, D.C., 13 F.Supp. 847, 849; United States ex rel. Baglivo v. Day, D.C., 28 F.2d 44; Perkins v. Elg, supra, 307 U.S. at page 334, 59 S.Ct. 884, 83 L.Ed. 1320.

■ Consequently, the naturalization of plaintiff's parents as Roumanian citizens while he was an infant had no legal effect upon plaintiff's American citizenship. True, under Roumanian law, he thereby became a national of Roumania, and was subject to its laws while in residence there; but, rather than losing his citizenship thereby, he acquired dual nationality. Perkins v. Elg, supra; United States ex rel. Rojak v. Marshall, D.C., 34 F.2d 219; United States ex rel. Scimeca v. Husband, 2 Cir., 6 F.2d 957, 958; In re Reid, supra, 6 F. Supp. at page 804.

■ In the case of United States ex rel. Scimeca v. Husband, supra, 6 F.2d at page 958, the Court by way of obiter dicta, discussing a situation similar to that of the instant case, said:

"That while a child born in this country, even of foreign parents, is born a citizen

of the United States, such citizenship * * * may be laid aside. The American doctrine is that the right of expatriation is inherent; it is expressed in a statute. R.S. § 1999 (Comp.St. § 3955 [8 U.S.C.A. § 800]). The question has often been passed on by the Department of State, and the result of our diplomatic holdings was summed up by Mr. Bayard, when Secretary, in 1888, by saying:

" 'It has been repeatedly held by us that, when a person born in the United States arrives at the age of 21 in a foreign country, the mode of expressing his election to be a citizen of the United States is by promptly returning to the United States. * * * That is what is called double allegiance, and by the law of nations the nationality of such persons is to be determined by their own election of nationality at their maturity, which election is evidenced by placing themselves in the country they elect.' Moore, International Digest, Vol. 3, p. 548."

The case of United States ex rel. Rojak v. Marshall, supra, cites with approval and follows the law laid down in the Scimeca case above.

Although the American Consul at Bucharest was following the instructions given him in the opinion of the Attorney General of the United States (in the case of Ingrid Therese Tobiassen, June 16, 1932, 36 Op.Atty.Gen. 535) when he held, on December 2, 1933, that plaintiff had lost his American citizenship by the naturalization of his parents, we know now that the Consul and the State Department were in error.

█ The plaintiff, however, cannot gain comfort from the fact that he did not lose his citizenship upon the naturalization of his parents in 1929. At that time plaintiff was an infant, and acquired a dual-nationality status, which imposed upon him the obligation to make a choice of nationality when he came of age.

"It has long been a recognized principle in this country that if a child born here is taken during his minority to the country of his parents' origin, where his parents resume their former allegiance, he does not thereby lose his citizenship in the United States provided that on attaining his majority he elects to retain that citizenship and to return to the United States to assume its duties. This principle was clearly stated by Attorney General Edwards Pierrepont in his letter of advice to the Secretary of State Hamilton Fish, in Steinkauler's Case, 1875, 15 Op.Atty.Gen. 15." Perkins v. Elg, supra, 307 U.S. at pages 329, 330, 59 S.Ct. at page 887, 83 L.Ed. 1320.

It would appear, therefore, that plaintiff was obliged to act affirmatively in order to retain his American citizenship on and after September 21, 1933. The most persuasive evidence of such election would have been his immediate return to the United States. United States ex rel. Scimeca v. Husband, supra; Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 161 F.2d 860. Hence, conversely, the law will presume that his continuing domicile constituted an election by him to choose Roumanian nationality unless it can be satisfactorily shown that such continued domicile was under duress, fear of imprisonment or such other circumstances as may have rendered the same involuntary.

What are the facts in this case? Assuming that plaintiff was lulled into inaction by his pending passport application on September 21, 1933, can it be said that after the Consul had spoken in December, 1933, the plaintiff was no longer charged with the duty of returning to the United States? The reported cases do not prescribe the various ways in which such return must be accomplished, i.e., whether under a passport or a visa, or as a stowaway, or whether such entry must be legal. It is merely laid down that the best evidence of an election (by one occupying the position of dual nationality) is a return to the United States. It was the plaintiff's obligation to free himself of the consequences of remaining in Roumania. This, admittedly, he could have done during all this time by the use of a visa, after a passport had been refused him.

█ Having failed to act promptly after attaining his majority, the burden was his to satisfactorily explain or excuse his dilatory conduct between September 21, 1933, and the time of his return in 1942. The

plaintiff accepted this burden when he pleaded and attempted to prove that he had not done anything since his birth to justify the contention of the Department of State that he had lost his citizenship.

In my opinion he failed to sustain his burden by a fair preponderance of the evidence. Neither his education nor military service necessitated his remaining any longer in Roumania, yet, not only did he fail to perfect his rights of American citizenship, but in 1939, he committed a final, fatal act which cut off any future right of election. On a visit to the United States in 1939 he placed a commercial assignment and the liquidation of his personal affairs in Roumania above the choice to establish his American citizenship, if it could be said that such choice still survived. The legal effect of his return to Roumania at this time is overwhelmingly against him. Even the circumstances of his eventual return raise a doubt as to his paramount intention in 1942. At that time he was a fugitive from German or Roumanian military justice. As a deserter from the army, he had to get out of Roumania. His marriage and connections at the American Consulate were fortuitous circumstances, certainly not indicative of a sincere desire to return to America for the purpose of manifesting his election to be an American rather than a Roumanian citizen. Moreover, he could not at this time revive his right to an election already made as a matter of law and fact.

The government raises two issues in its affirmative defenses, either of which could defeat the plaintiff's cause of action. Both of them deal with the question of expatriation, one under the Nationality Act of 1907 and the other under the Act of 1940.

Nationality Act of 1907, Chap. 2534, 34 Stat. 1228. "An Act in reference to the expatriation of citizens and their protection abroad.

*   *   *   *   *   *

"Sec. 2. That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state. *   *   *"

Nationality Act of 1940, 8 U.S.C.A. § 801. "General means of losing United States nationality.

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:
*   *   *

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state; or

"(d) Accepting, or performing the duties of, any office, post, or employment under the government of a foreign state or political subdivision thereof for which only nationals of such state are eligible;
*   *   *"

Nationality Act of 1940, 8 U.S.C.A. § 802. "Presumption of expatriation.

"A national of the United States who was born in the United States or who was born in any place outside of the jurisdiction of the United States of a parent who was born in the United States, shall be presumed to have expatriated himself under subsection (c) or (d) of section 801, when he shall remain for six months or longer within any foreign state of which he or either of his parents shall have been a national according to the laws of such foreign state, or within any place under control of such foreign state, and such presumption shall exist until overcome whether or not the individual has returned to the United States. Such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, or to an immigration officer of the United States, under such rules and regulations as the Department of State and the Department of Justice jointly prescribe. *   *   *"

In anticipation of these defenses, the plaintiff pleaded and attempted to prove that he had not done anything since his birth to expatriate himself.

The plaintiff admits that he served in the Roumanian army on two occasions: first, from October, 1936, to October, 1937, and second from May, 1941, to October, 1941. He also admits that he was a military reservist in the period intervening be-

tween his two entries into the army. However, he alleges that such military service was involuntary in that it was induced by compulsion and fear of imprisonment.

The government, on the other hand, contends that while the plaintiff did not volunteer or serve willingly, yet, having failed to take steps to avoid such service in each instance, he cannot now be heard to say that such service was involuntary. In other words, it claims that plaintiff, having voluntarily placed himself in a position of peril, cannot now use such peril as a cloak.

Both sides agree that plaintiff's oath of allegiance in 1936, is dependent upon the nature of the service, and is not controlling, if such service be held to be involuntary.

Plaintiff relies upon the efforts he made from 1931 to 1934 to obtain an American passport. Such a document, he claims, if obtained, would have had the effect of providing him with the only acceptable evidence to protest against or claim exemption from military service in 1934. Failing to obtain the same, he maintains that he had no choice but to submit or face imprisonment, and that by reason thereof, his service was performed under duress, and hence, was involuntary. In support of his claim, plaintiff offered the Recruitment Laws of Roumania in effect at the time, and had a former Roumanian lawyer, David Avram, testify to his interpretation of the law. I am not persuaded that plaintiff's contention is supported by the law or the facts.

Plaintiff's expert witness testified that every Roumanian national was automatically placed upon the Recruitment rolls upon reaching 19 years of age, and received a preliminary physical examination; that upon reaching his majority, he was obliged to report for military service unless a claim for exemption was made. The Roumanian law provided in cases of exemption as follows:

"In case the citizenship claimed by these young men shall be proven to be without ground, * * * they shall be recruited with the next class to serve in the Army one year after the period for which they are found fit." (Plaintiff's Ex. 2, Par. 4 of Article 2.)

Hence there was provision to interpose objection to service on the ground of foreign nationality. And if the objector should fail in his proof, the only penalty, if I read the law correctly, is a longer period of service. But the gist of the plaintiff's argument is based upon another provision of this law which reads as follows:

"Young men, who by fraud or subterfuge, omitted themselves from the recruitment rolls as well as those who have endeavored to create for themselves a status not corresponding with reality, shall be prosecuted and punished with imprisonment from four months to one year." (Plaintiff's Ex. 2, Article 81.)

The plaintiff maintains, and his expert witness so stated, that the only acceptable proof of foreign citizenship was a document, such as a passport, and a permit, which all foreigners were obliged to carry, and that anything less than this would be unacceptable to the authorities, and would be held against the objector as an attempt to create for himself a status not corresponding with reality, and would therefore subject him to imprisonment. The plaintiff states that he did not avail himself of the aforementioned exemption provisions because he did not have the document required by law, and that without such document his claim of exemption would be futile and unavailing, and would subject him to imprisonment.

The plaintiff attained his majority on September 21, 1933, at which time he was required to report for military service. At the time, he had not yet received a decision upon his passport application. I am inclined to the belief that plaintiff's American birth certificate, and the affidavits of the two witnesses which he submitted to the American Consul in support of his passport application, would have been sufficient documentary proof, if submitted to the Roumanian authorities to support his claim to exemption from military service, or, at least to remove the stigma that he was attempting to assert a colorless claim thereto. The plaintiff's own expert on Roumanian law admitted that he did not feel qualified to answer the question as to what the Roumanian authorities would do in a case where a person did not have a pass-

port and permit. He was sure only that having it would save the objector from imprisonment in case of an adverse decision.

The plaintiff's failure to avail himself of the provisions of the Recruitment law on the ground that it would have been a futile gesture, and would have subjected him to imprisonment, is at least, open to doubt. But there are other facts, which, taken together, tend to cast doubt on plaintiff's claim that his service was involuntary. For one thing, he could have left Roumania on a visa, as heretofore referred to in the discussion of the question of dual nationality. Further, plaintiff made no formal protest to the American authorities of his impending impressment into military service. Then again, while he did not volunteer for service, he did, however, obtain a deferment for the purpose of continuing his studies, which act can hardly be reconciled with his insistence that his service was wholly involuntary. Furthermore, after his discharge from service, he showed no inclination to pursue his claim of American citizenship. He continued to remain in Roumania, knowing that he was on the reserve lists, and subject to recall for duty. I must again refer to his visit to the United States in 1939, and his subsequent return to Roumania, at a time when he must have been aware of the fact that war in Europe was imminent, and that he might be called up for duty. He knew at this time that he had been raised to the rank of a commissioned officer, the acceptance of which, it seems to me, must be presumed by his voluntary return to Roumania.

I am inclined to agree with the government's contention that the plaintiff's actions and conduct, while they may not prove that plaintiff's service was in fact voluntary, at least cast great doubt on his claim that such service was involuntary.

The burden is on the plaintiff, and he has failed to sustain it. The cases cited by the plaintiff do not support his case. The case of Dos Reis ex rel. Camara v. Nicholls, 1 Cir., 161 F.2d 860, is easily distinguishable. In the first place, Camara stood up to the Portugese authorities and resisted induction. He also sought the protection of the American authorities without success, being told that he had the alternative of joining the American forces by returning to the United States, but, if that could be called an alternative, he was without financial means to take advantage of it. And, what is most important, it was proved that Camara never swore allegiance to Portugal. Lastly, when his service had been completed, he stowed away aboard an airplane and came to the United States. The District Court, in interpreting the Act of 1940, held that the question of volition did not enter into the consideration of the matter. It was sufficient that Camara had served in the Portugese army while a national of Portugal (even though under the principle of dual nationality he was also an American citizen). The Circuit Court overruled the District Court and held that, Camara's service being involuntary, he was relieved from the effect of the Act. The Court said, at page 862 of 161 F.2d:

"When he was taken to Portugal during his minority, Portugal had a claim upon him as a Portugese citizen, by derivation from his father's citizenship. His case presented a familiar situation of dual nationality as recognized in international law. But Camara never forswore his American allegiance; upon the contrary, he has done what he could to assert it and preserve it. His service in the Portugese army, with a concentration camp as the alternative, was under duress. As soon as he could manage it he returned to this country, as a stowaway, which attests the intensity of his purpose to retain his American citizenship."

The conduct of this plaintiff before and after induction does not manifest the same intensity of purpose to assert and preserve his American citizenship as Camara displayed.

The plaintiff also relies upon the case of In re Gogal reported in D.C., 75 F.Supp. 268. In that case the Court found as a fact that Gogal's service was involuntary; it spoke favorably of Gogal's conduct in resisting induction. As a matter of fact, Gogal, having ignored the summons of the Czechoslovakian authorities, was forceably inducted into military service. Gogal spoke no English and lived quite a distance from

the nearest Consulate. He confidently relied upon what, to him, was his unquestioned American citizenship. The Court found, as a fact, that Gogal never took an oath of allegiance to Czechoslovakia. After his discharge, he married and had two children. In 1927, three years after his discharge he sought an American passport, but it was denied him on the ground that he had lost his American citizenship. Gogal, it should be remembered, was not clothed with dual nationality; hence, his obligation to leave Czechoslavakia was not as great as that of the plaintiff to leave Roumania. Shortly thereafter, Gogal came to the United States, where he has since resided. He served in the United States Army during World War II.

Considering all of the facts and circumstances, I am inclined to doubt that either of the periods of military service of the plaintiff in the Roumanian army was involuntary. I am constrained, therefore, to find in favor of the defendant.

Submit on notice findings of fact and conclusions of law in conformity herewith.